1    Richard F. Holley, Esq. (NV Bar No. 3077)
     Email: rholley@nevadafirm.com
2    Ogonna M. Atamoh, Esq. (NV Bar No. 7589)          E-filed on:  May 25, 2010
     Email: oatamoh@nevadafirm.com
3    SANTORO, DRIGGS, WALCH,
     KEARNEY, HOLLEY & THOMPSON
4    400 South Fourth Street, Third Floor
     Las Vegas, Nevada 89101
5    Telephone:     702/791-0308
     Facsimile:     702/791-1912
6
7    *Attorneys for Forouzan, Inc. and RPN, LLC, Saiid Forouzan Rad, and Phillip Nourafchan*

     Julie Sanpei, Esq. (NV Bar No. 5479)
8    Email: jsanpei@bckltd.com
     BAILUS COOK & KELESIS, LTD.
9    400 South Fourth Street, Third Floor
     Las Vegas, Nevada 89101
10   Telephone:     702/385-3788
     Facsimile:     702/737-7712
11
12   *Attorneys for R&S St. Rose, LLC*

13              **UNITED STATES BANKRUPTCY COURT**

14                     **DISTRICT OF NEVADA**

15   In re:                              | Case No. BK-S-10-18827-MKN
                                         | Involuntary Chapter 7
16   R&S ST. ROSE, LLC,                  |
                                         | **MOTION TO DISMISS INVOLUNTARY**
17              Alleged Debtor.          | **PETITION**

18                                       |
                                         | Date of Hearing:     OST Pending
19                                       | Time of Hearing:     OST Pending
                                         | Place: Courtroom No. 2, Third Floor
20                                       |                      Foley Federal Building
                                         |                      300 Las Vegas Blvd., S.
21                                       |                      Las Vegas, NV 89101
22                                       |
                                         | Judge: Hon. Mike K. Nakagawa
23

24         R&S ST. ROSE, LLC ("R&S St. Rose"), by and through its counsel Julie L. Sanpei, Esq.

25   with the law offices of BAILUS COOK & KELESIS, LTD., and FOROUZAN, INC. and RPN,

26   LLC, SAIID FOROUZAN RAD, and PHILLIP NOURAFCHAN, by and through their counsel

27   Richard F. Holley, Esq., with the law offices of SANTORO, DRIGGS, WALCH, KEARNEY,

28   HOLLEY & THOMPSON, hereby file this Motion to Dismiss Involuntary Petition ("Motion to

07906-01.001/599898.doc

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1  Dismiss") based upon the following grounds and for the following reasons: First, the involuntary

2  petition filed by Branch Banking & Trust ("BB&T") through its Senior Vice President David B.

3  Byrne, Jr., should be dismissed because the involuntary petition was filed in bad faith.  The

4  Involuntary Petition was filed by BB&T in furtherance of a two party dispute concerning the

5  priority of two deeds of trust encumbering the sole real property asset of R&S St. Rose.  After a

6  10-day trial spanning a four (4) month period, the trial court granted a Rule 52 motion and ruled

7  that BB&T had failed to meets its burden of proof in establishing that it was the assignee of a

8  $43M DOT (defined below) from the Federal Deposit Insurance Corporation ('FDIC"), as

9  receiver for Colonial Bank, N.A. ("Colonial Bank").  As a result of the ruling, the trial court

10  found that the $43M DOT was junior in priority to a $12M DOT recorded by R&S St. Rose

11  Lenders, LLC ("St. Rose Lenders").  BB&T is attempting to use the involuntary bankruptcy

12  petition process to collaterally attack and circumvent the trial court ruling regarding the alleged

13  assignment by arguing that BB&T is a qualified petitioning creditor. BB&T is also attempting to

14  use the involuntary bankruptcy petition process to stay a foreclosure sale of the $12M DOT by

15  St. Rose Lenders and thus avoid the posting of a, pending appeal of the trial court's ruling.[1]

16      Second, and in the alternative, this Court should abstain from exercising its jurisdiction

17  pursuant to 11 U.S.C. § 305 and dismiss the Involuntary Petition because the interests of the

18  creditors and the putative debtor would be better served by dismissal.  Abstention and dismissal

19  of this bankruptcy case is appropriate because (i) the involuntary petition is in furtherance of a

20  two party dispute regarding priority of two deeds of trust encumbering real property owned by

21  R&S St. Rose; (ii) the Involuntary Petition was filed to collaterally attack and circumvent the

22  trial court ruling regarding the alleged assignment of the $43M DOT to BB&T; (iii) the

23  Involuntary Petition was filed to stay foreclosure of the $12M DOT and to avoid posting a bond

24  pending appeal of the trial court's ruling; (iii) the Involuntary Petition does not satisfy any

25  legitimate bankruptcy purpose where there is no equity in the putative debtor's real property and

26  the property is not necessary for an effective reorganization where BB&T commenced the

---

[1] In the event the Involuntary Petition is dismissed for bad faith, the Movants request an award of attorneys' fees and costs for bringing this motion pursuant to 11 U.S.C. § 303(i)

- 2 -

1    Involuntary Petition under Chapter 7. The real property owned by R&S St. Rose has an

2    estimated fair market value of approximately $ 23.5 million, but is encumbered by a $12M DOT

3    and a $43M DOT leaving no equity in the property for R&S. St. Rose. Finally, there is no

4    prejudice to BB&T or any other creditor if the Involuntary Bankruptcy Petition is dismissed.

5         This Motion is supported by the Declaration of Saiid Forouzan Rad (the "Forouzan

6    Declaration"), the president and shareholder of Forouzan, Inc. ("Forouzan Inc."), a Nevada

7    corporation, one of two managers and members of R&S St Rose, and the Declaration of Richard

8    F. Holley, Esq. (the "Holley Declaration"), lead counsel for Saiid Forouzan Rad ("Rad"),

9    Forouzan Inc., Phillip Nourafchan ("Nourafchan") and RPN, LLC, a Nevada limited liability

10   company ("RPN"), in the state court action. Both of the declarations are filed concurrently with

11   the Motion. The Motion is further based upon the memorandum of points and authorities, and

12   any and all oral argument entertained at the time of hearing.

13        Dated this 25th day of May, 2010.

14        **SANTORO, DRIGGS, WALCH,**
          **KEARNEY, HOLLEY & THOMPSON**

15

16

17        Richard F. Holley, Esq. (NV Bar No. 3077)
          Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
18        400 South Fourth Street, Third Floor
          Las Vegas, Nevada 89101
19        Telephone: 702/791-0308
          Facsimile: 702/791-1912
20        *Attorneys for Forouzan, Inc. and RPN, LLL,*
          *Saiid Forouzan Rad, and Phillip Nourafchan*
21
          **BAILUS COOK & KELESIS, LTD.**
22

23        ___/s/ Julie Sanpei___
          Julie Sanpei, Esq. (NV Bar No. 5479)
24        400 South Fourth Street, Third Floor
          Las Vegas, Nevada 89101
25        Telephone: 702/385-3788
          Facsimile: 702/737-7712
26        *Attorneys for R&S St. Rose, LLC*

27

28

07906-01.001/599898.doc

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF RELEVANT FACTS

### R&S St. Rose Real Property Transaction

1.     As set forth in the Forouzan Declaration, R&S St. Rose was formed in August 2005 for the sole purpose of land-banking thirty-eight acres of real property located at St. Rose Parkway and Spencer Road in Henderson, Nevada (the "Property") for Centex Homes ("Centex"), a residential real estate developer.[2] See Forouzan Declaration.

2.     On August 26, 2005, R&S St. Rose purchased the Property for $45,131,414.11. Pursuant to an Option Agreement between R&S St. Rose and Centex, Centex had the option to purchase the Property from R&S St. Rose on or before September 6, 2006 for approximately $54,102,000.00. Id.

3.     To purchase the Property, R&S St. Rose obtained funds from three different sources: (1) Colonial Bank; (2) Centex non-refundable deposits; and (3) St. Rose Lenders[3], who obtained the funds from private lenders. Id.

4.     R&S St. Rose borrowed $29,305,250.00 from Colonial Bank, which was evidenced by a Loan Agreement, Promissory Note and Deed of Trust, all of which are dated August 16, 2005.  A true copy of the Loan Agreement, Promissory Note and Deed of Trust is attached to the Forouzan Declaration as **Exhibits "1", "2" and "3"** respectively.

5.     The loan was for a period of twelve months with an option to extend the loan for an additional six months. See Forouzan Declaration.

6.     The loan was secured by a first deed of trust against the Property in favor of Colonial Bank.  The deed of trust was recorded on August 26, 2005.  The August 16, 2005

---

[2] Developers such as Centex Homes are often restricted from acquiring property until all of the entitlements are in place.  In order to address this situation, developers such as Centex Homes arrange for a third party "Land Banker" to acquire the property while the developer obtains the entitlements.  At closing, the developer obtains the option to purchase the property at a later date and for a greater purchase price.  During the option period, the developer completes the entitlement process at its own expense and proceeds to purchase the property at the higher purchase price.  This process is referred to as "land-banking".  See Forouzan Declaration.

[3] St. Rose Lenders is a Nevada limited liability company wholly owned and managed by Forouzan Inc. and RPN.  See Forouzan Declaration.

07906-01.001/599898.doc

SANTORO, DRIGGS, WALCH
KEARNEY, HOLLEY & THOMPSON

SDW

1  Promissory Note and recorded Deed of Trust are hereafter referred to as the "$29M DOT" and a

2  true copy of which is attached to the Forouzan Declaration as **Exhibit "3"**.

3      7.    Nourafchan and Forouzan each signed personal guarantees that guaranteed

4  repayment of the $29M DOT.   A true copy of the joint personal guaranty is attached to the

5  Forouzan Declaration as **Exhibit "4"**.

6      8.    R&S St. Rose applied $8,100,000.00 from the non-refundable earnest money

7  deposits from Centex towards the purchase of the Property. See Forouzan Declaration.

8      9.    R&S St. Rose also borrowed approximately $12,000,000.00 from St. Rose

9  Lenders which was evidenced by a Promissory Note and Second Deed of Trust.  The Second

10  Deed of Trust in favor of St. Rose Lenders was recorded on September 16, 2005.   The

11  $12,000,000.00 Promissory Note and recorded Second Deed of Trust are hereafter referred to as

12  the "$12M DOT".   A true and correct copy of the Promissory Note and Deed of Trust are

13  attached to the Forouzan Declaration as **Exhibits "5" and "6"**.

14      10.   Approximately one month before expiration of the Centex option period, Centex

15  informed R&S St. Rose that it was forfeiting its deposit of $8,100,000.00 and did not intend to

16  exercise the purchase option. See Forouzan Declaration.

17      11.   On March 19, 2007, R&S St. Rose and Colonial Bank entered into a Modification

18  to Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rents (the

19  "Modification") and an Amendment to Promissory Note Secured by Deed of Trust (the

20  "Amendment"), in which R&S St. Rose and Colonial Bank agreed to extend the maturity date of

21  the Note for a few months, until August 25, 2007.   A true and correct copy of the Modification is

22  attached to the Forouzan Declaration as **Exhibit "7"** and the Amendment is attached to the

23  Forouzan Declaration as **Exhibit "8"**.

24      12.   Nevada Title handled the Modification closing transaction and required both R&S

25  St. Rose, as the owner, and St. Rose Lenders, as the beneficiary, to execute an agreement

26  subordinating the St. Rose Lenders $12M DOT, hereinafter referred to as the "Subordination

27  Agreement", and a true copy of which is attached to the Forouzan Declaration as **Exhibit "9"**.

28

- 5 -

07906-01.001/599898.doc

13. Nevada Title recorded both the Modification and the Subordination Agreement on June 4, 2007. See Forouzan Declaration.

14. Prior to expiration of the extended maturity date for the Modification, Colonial Bank and R&S St. Rose agreed to the terms of a new distinct construction loan for the development of the Property ("Construction Loan"). On July 27, 2007, Colonial Bank and R&S St. Rose entered into the Construction Loan. See Forouzan Declaration.

15. The total encumbrance added to the Property at the time of closing was $33,031,873.72. This amount consisted of (i) a $439,800.00 loan fee to Colonial Bank; (ii) the payoff of Colonial Bank's 2005 loan in the amount of $29,779,628.72; (iii) a reconveyance fee of $45.00; (iv) $3,000.00 for the appraisal; (v) $500.00 for an appraisal review fee; (vi) $900.00 for an underwriting fee; and (vii) $2,808,000.00 as an interest reserve. Id.

16. The total amount of the Construction Loan that was approved by Colonial Bank was $43,980,000. Id.

17. After the Construction Loan closed, R&S St. Rose was allowed to submit requests to Colonial Bank for additional funds, as needed for construction, up to the total amount of the loan. Id.

18. The Construction Loan was evidenced by a Construction Loan Agreement, Promissory Note and Deed of Trust (collectively the "Construction Loan Documents"). True and correct copies of the Construction Loan Agreement, Promissory Note and Deed of Trust are attached to the Forouzan Declaration as **Exhibits "10", "11" and "12"**.

19. At the time of the closing of the Construction Loan, Colonial Bank paid itself sums to satisfy the original $29M DOT and executed a reconveyance, which was duly recorded. A true copy of the reconveyance is attached to the Forouzan Declaration as **Exhibit "13"**.

20. The Deed of Trust in favor of Colonial Bank relating to the Construction Loan was recorded on July 31, 2007. (This Construction Loan evidenced by a Construction Loan Agreement, Promissory Note and recorded Deed of Trust are hereafter referred to as the "$43M DOT").

. . .

- 6 -

07906-01.001/599898.doc

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

21.    At the time the $43M DOT was recorded in August 2007, it was subordinate in time to the $12M DOT, and has remained so through the present. See Forouzan Declaration.

22.    St. Rose Lenders was not a party to the Construction Loan Documents and was not a guarantor. See Forouzan Declaration.

23.    The Construction Loan was for eighteen months (January 30, 2009) with an option to extend the term for an additional six months. See Forouzan Declaration.

24.    R&S St. Rose was unable to develop the Property and on April 2, 2009, Colonial Bank demanded that R&S St. Rose cure its default as a result of its failure to pay the balance of the principal and accrued interest when due.  On April 28, 2009, Colonial Bank recorded a Notice of Default and Election to Sell.  A true copy of that Notice of Default and Election to Sell is attached to the Forouzan Declaration as **Exhibit "14"**.

25.    On July 15, 2009, St. Rose Lenders also commenced foreclosure proceedings by recording a Notice of Default and Election to Sell.  A true copy of that Notice of Default and Election to Sell is attached to the Forouzan Declaration as **Exhibit "15"**.

**State Court Litigation**

26.    On November 3, 2008, Robert Murdock ("Murdock") and Eckley Keach ("Keach") (collectively referred to as "Plaintiffs") filed a Complaint against R&S St. Rose, St. Rose Lenders, Rad, Nourafchan, Forouzan, Inc. and RPN in the Eighth Judicial District Court, Clark County, Nevada, Case No. A574852, Dept. XI.  The complaint contained allegations sounding in breach of contract, unjust enrichment and fraud.  On April 3, 2009, Plaintiffs filed a Second Amended Complaint ("Keach/Murdock Action") adding claims against Colonial Bancgroup, LLC (believed to be the holding company for Colonial Bank), and R&S Investment Group ("R&S Investment")[4].  See Forouzan Declaration.  A true and correct copy of the Second Amended Complaint is attached to the Holley Declaration as **Exhibit "1"**.

27.    On July 1, 2009, Colonial Bank filed Case No. 09-A-594512-C in the Eighth Judicial District Court, Clark County, Nevada ("Colonial Bank Action").  In the Colonial Bank

---

[4] R&S Investment Group is a Nevada limited liability company owned equally by Nourafchan and Forouzan. See Forouzan Declaration.

- 7 -

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1    Action, Colonial Bank alleged under a variety of theories, that its $43M DOT had priority over

2    the St. Rose Lenders $12M DOT. Id.

3         28.    In addition, Colonial Bank asserted claims for unjust enrichment, fraud and civil

4    conspiracy. A true and correct copy of the Colonial Bank Complaint is attached to the Holley

5    Declaration as **Exhibit "2"**.

6         29.    In or about August 2009, the Federal Deposit Insurance Corporation ("FDIC")

7    took over Colonial Bank as receiver. See Forouzan Declaration and Holley Declaration.

8         30.    Upon information and belief, on or about August 14, 2009, the FDIC and BB&T

9    entered into a Purchase and Assumption Agreement whereby BB&T purchased some of the

10   assets of Colonial Bank. Id.

11        31.    On October 1, 2009, BB&T filed an Amended Complaint in place of Colonial

12   Bank in which BB&T alleged it was successor in interest to the FDIC as receiver for Colonial

13   Bank. On October 7, 2009, BB&T filed a Second Amended Complaint. A true and correct copy

14   of the BB&T Second Amended Complaint is attached to the Holley Declaration as **Exhibit "3"**.

15   In the Second Amended Complaint, BB&T continued to assert theories of priority of the $43M

16   DOT over the St. Rose Lenders $12M DOT, including contractual subrogation, equitable

17   subrogation, replacement, equitable/promissory estoppel, as well as claims for unjust enrichment,

18   fraud and civil conspiracy. BB&T also added R&S Investment as a party defendant. St. Rose

19   Lenders filed a counterclaim against BB&T on October 27, 2009 seeking a declaration that the

20   $12M DOT had priority over the $43M DOT. A true and correct copy of the St. Rose Lenders

21   Counterclaim is attached to the Holley Declaration as **Exhibit "4"**. All actions were consolidated

22   on October 22, 2009 in Case No. A574852 before Dept. XI. See Forouzan Declaration; see also

23   Holley Declaration.

24        32.    Both St. Rose Lenders and BB&T sought injunctive relief to prevent the other

25   from foreclosing on the Property pending a determination by the trial court regarding the priority

26   of the deeds of trust. The trial court granted a mutual temporary restraining order preventing

27   either party from moving forward with foreclosure until the issue of priority was resolved. With

28   the consent of the parties, the Court consolidated the preliminary injunction hearing with a trial

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

on the merits regarding BB&T's claims for relief for contractual subrogation, equitable subrogation, replacement, equitable/promissory estoppel, and unjust enrichment. The parties also consented to an extension of the temporary restraining order until the conclusion of the trial and evidentiary hearing. Id.

33.    The trial commenced on January 8, 2010 with BB&T presenting its case-in-chief. The trial continued over the ensuing four (4) months for a total of ten days until April 14, 2010. Id.

34.    At the conclusion of BB&T's case-in-chief, Plaintiffs Murdock and Keach and Defendants Rad, Nourafchan, Forouzan Inc., RPN, R&S St. Rose, St. Rose Lenders, and R&S Investment Group, made an oral motion pursuant to Rule 52 of the Nevada Rules of Civil Procedure for a ruling against BB&T ("Rule 52 Motion"). The primary issue raised in the Rule 52 Motion was whether BB&T had met its evidentiary burden of proof to demonstrate it received an assignment of Colonial Bank's interest in the $43M DOT. See Holley Declaration.

35.    In response to the Rule 52 Motion, BB&T made several oral motions including a motion under Rule 17 and Rule 25 of the Nevada Rules of Civil Procedure to substitute the FDIC as the real party-in-interest in the place and stead of BB&T. In response to the oral motion, the trial court established a briefing schedule and directed the parties to prepare and submit written briefs on the substitution issue. See Holley Declaration.

36.    The hearing on the substitution issue took place on April 13, 2010. A true and correct copy of the April 13, 2010 hearing transcript is attached to the Holley Declaration as **Exhibit "5"**. As reflected in the transcript, the court denied BB&T's motion to substitute the FDIC as the real-party-in-interest. See **Exhibit "5"** at p.25, ll. 15-25 to Holley Declaration.

37.    The trial court resumed the hearing on the Rule 52 Motion on April 14, 2010. A true and correct copy of the April 14, 2010 hearing transcript is attached to the Holley Declaration as **Exhibit "6"**. As reflected in the transcript, the trial court granted the Rule 52 Motion. See **Exhibit "6"** at p.27, ll. 14-21 to the Holley Declaration. The trial court also directed Mr. Keach to prepare findings of fact and conclusions of law with respect to the Rule 52 Motion. See Holley Declaration.

- 9 -

38.     After the trial court issued its ruling, BB&T, through its counsel, Mr. Douglas Gerrard, Esq., immediately made an oral motion for a stay of the St. Rose Lenders' foreclosure pending the outcome of an appeal and for a Rule 54(b) certification of the trial court's ruling. Id., at p.29, ll. 24-25; pp.30-33.  After some discussion, Mr. Gerrard advised the trial court that he would file a motion to dismiss the remaining claims for relief in order to pave the way for an appeal of the Rule 52 Motion as well as a motion to stay the St. Rose Lenders' foreclosure pending appeal. Id. at p.33, ll. 19-25, p.34, ll. 1-4.  This then led to a discussion between counsel and the court regarding the continued imposition of the temporary restraining order for the statutory 15-day time period after entry of the findings of fact, conclusions of law and order granting the Rule 52 Motion. Id. at p. 34, ll. 5-25; p.35, ll. 1-9.

39.     Thereafter, on or about April 28, 2010, BB&T filed a Voluntary Motion to Dismiss its Remaining Claims to Certify Order as Final ("Motion to Dismiss") and Motion to Stay Foreclosure Pending Appeal on Order for Shortening Time ("Motion to Stay Foreclosure"). A true and correct copy of the Motion to Dismiss and the Motion to Stay Foreclosure is attached as **Exhibit "7"**.  At the hearing held on May 4, 2010, the trial court granted BB&T's Motion to Dismiss, but denied its Motion to Stay Foreclosure to enjoin the St. Rose Lenders foreclosure sale scheduled for June 1, 2010.  A true and correct copy of the minutes of the hearing is attached to the Holley Declaration as **Exhibit "8"**.

40.     At the hearing, Murdock and Keach also made an oral motion to voluntarily dismiss its remaining claims for relief.[5]  This motion was also granted by the trial court. Id.

**Involuntary Bankruptcy Petition**

41.     After the trial court denied BB&T's Motion to Stay Foreclosure of the St. Rose Lenders foreclosure sale scheduled for June 1, 2010, and while the parties were in the process of preparing findings of fact, conclusions of law and judgment on the Rule 52 Motion, BB&T filed the Involuntary Petition under Chapter 7 of the Bankruptcy Code against R&S St. Rose.  See *Involuntary Petition* [DKT 1].

---

[5]  The trial court had earlier granted a motion for summary judgment in favor of Murdock and Keach against St. Rose Lenders.

- 10 -

07906-01.001/599898.doc

42.    The Property is the primary, if not sole asset of R&S St. Rose.  See Forouzan Declaration.

43.    The primary debts of R&S St. Rose are those arising out of the $12M DOT and the $43M DOT.  See Forouzan Declaration.

44.    During the evidentiary hearing and trial in state court, St. Rose Lenders included as its proposed trial exhibit no. 49, a Summary Appraisal Report of Vacant Parcel of Land Owned by R&S St. Rose LLC dated November 4, 2009 by Heidi H. Kent ("Kent Appraisal") estimating the fair market value of the Property at $23,555,000.00.  A copy of the Kent Appraisal was included in the exhibit binder given to Mr. Gerrard at the beginning of the evidentiary hearing.  A true and correct copy of the St. Rose proposed trial exhibit no. 49 consisting of the Kent Appraisal is attached to the Holley Declaration as **Exhibit "10"**.

45.    The outstanding liens on the Property total approximately $45,555,000, resulting in an unsecured deficiency of roughly $22,000,000.  See Forouzan Declaration.

## II.    LEGAL ARGUMENT

### A.    Standard for Dismissal of an Involuntary Bankruptcy Case for Bad Faith

In the involuntary petition context, Section 303(b) does not expressly refer to good faith filings.  See 2 Collier on Bankruptcy ¶ 303.16 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).  However, since section 303(i) specifically refers to bad faith filings, it is generally agreed that involuntary filings must be made in good faith and that consequences flow if they are not. Id. Dismissal is one possible consequence. Id.  If there has been bad faith, a debtor may also be awarded damages, including punitive damages, under section 303(i)(2). Id.

Bad faith for purposes of section 303(b) is not defined in the Code. Id. Numerous acts and omissions have been considered as bad faith, and courts have developed differing tests for determining whether creditors are exhibiting bad faith. Id. A bankruptcy court's determination that a creditor filed an involuntary petition in bad faith is a question of fact, subject to a clearly erroneous standard on appeal. Id. (citing Adell v. John Richards Homes Building Co., L.L.C. (In re John Richards Homes Bldg. Co., L.L.C.), 439 F.3d 248 (6th Cir. 2006)).  There is a

. . .

presumption in favor of good faith filings, and the burden is on the debtor to show by a

preponderance of the evidence that the filing is in bad faith. Id.[6]

There have been a wide range of tests applied by the courts for determining bad faith,

several of which tend to shade off into one another. See 2 Collier on Bankruptcy ¶ 303.16[1]

(citing Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.), 61 B.R. 614 (B.A.P. 9th Cir. 1986)).

There are now six identifiable standards: (i) the subjective test; (ii) the improper purpose test;

(iii) the objective test; (iv) the improper use test; (v) the combined objective and subjective test,

sometimes referred to as the " Rule 9011" test; and (vi) the totality of the circumstances test,

which combines the improper purpose and improper use tests. See 2 Collier on Bankruptcy ¶

303.16[1].

One court has suggested a seventh approach: the nose test. Id. The subjective test looks

at what the petitioning creditor in question believed,[7] focusing on the petitioning creditor's

motivation in filing the involuntary case.[8] For example, if the creditor's motive in filing was

simply to harass the debtor rather than to collect an unpaid obligation, there would be subjective

evidence of bad faith. Id. Other courts adopt an "improper purpose" test, which is similar to the

subjective test and assesses why the creditor sought to file the involuntary case in the first

instance.[9] Id. Examples include ruining and destroying the debtor and maliciously seeking to

undermine the debtor's business. Id. Other courts utilize an objective standard, assessing what a

---

[6] Citing In re Synergistic Techs., 2007 Bankr. LEXIS 2660 (Bankr. N.D. Tex. Aug. 6, 2007); Porter v. United States (In re United States), 2006 Bankr. LEXIS 1830 (Bankr. M.D. Fla. June 1, 2006); In re E.S. Professional Servs., Inc., 335 B.R. 221, 226 (Bankr. S.D. Fla. 2005); In re Alta Title Co., 55 B.R. 133 (Bankr. D. Utah 1985).

[7] See Basin Elec. Power Coop. v. Midwest Processing Co., 47 B.R. 903 (D.N.D. 1984), aff'd, 769 F.2d 483 (8th Cir. 1985), cert. denied, 474 U.S. 1083 (1986).

[8] See In re Fox Island Square P'ship, 106 B.R. 962 (Bankr. N.D. Ill. 1989).

[9] See, e.g., Adell v. John Richards Homes Bldg Co. (In re John Richards Homes Bldg. Co.), 439 F.3d 248, 256-57 (6th Cir. 2006) (bankruptcy court concluded creditor filed petition with wrongful intent to intimidate debtor into settlement and when that failed, to damage and destroy his reputation); Bock Transp., Inc. v. Paul (In re Bock Transp., Inc.), 327 B.R. 378 (B.A.P. 8th Cir. 2005) (threatening to file involuntary to force principal to pay corporate debt was not relevant: court must focus on creditor's actual filing which had no improper purpose); In re St. Marie Dev. Corp., 334 B.R. 663 (Bankr. D. Mont. 2005) (bad faith exists when petitioning creditors file involuntary to protect their own interest and thereby gain disproportionate advantage); In re Tichy Elec. Co., 332 B.R. 364, 377 (Bankr. N.D. Iowa 2005) (petitioning union trust funds filed in bad faith because they filed solely to collect debts owed to them: they used bankruptcy process both to obtain disproportionate advantage over all other creditors and as a weapon to satisfy their claims).

- 12 -

1    reasonable person in the creditor's position would have done.[10] Id. This calls for an assessment

2    of the reasonableness of the creditor's action in filing an involuntary petition. Id. Still other

3    courts rely upon an "improper use" test, which looks at whether the creditor's conduct takes

4    disproportionate advantage of other creditors.[11] Id. Examples include using the bankruptcy to

5    acquire corporate control, reducing an obligation on a guaranty or treating the bankruptcy

6    process as if it were the creditor's own private collection agency. Other courts utilize a test that

7    contains both objective and subjective elements.[12] This is considered a broad, inclusive test. See

8    In re Dino's Inc., 183 B.R. 779 (S.D. Ohio 1995). The combined test has been likened to the test

9    utilized in Bankruptcy Rule 9011. One court has criticized this approach because Rule 9011

10    deals with careless omissions that do not rise to the level of bad faith. See In re Val W. Poterek

11    & Sons, Inc., 169 B.R. 896 (Bankr. N.D. Ill. 1994).

12         Finally, the "smell" test, which is actually the broadest of all the standards, looks to all of

13    the foregoing tests and operates on the premise that if it smells like bad faith, it can be fit into

14    any, indeed all, of the above-listed tests. See In re Loe, 57 C.B.C.2d 1258, 2007 Bankr. LEXIS

15    1146 (Bankr. S.D. Fla. 2007) (filing of abusive involuntary petition is "odious"); In re Better

16    Care, Ltd., 97 B.R. 405 (Bankr. N.D. Ill. 1989). This is akin to a totality of the circumstances

17    test. Several courts have explicitly adopted a "totality of the circumstances" standard. See, e.g.,

18    Adell v. John Richards Homes Building Co., L.L.C. (In re John Richards Homes Bldg. Co.,

19    L.L.C.), 439 F.3d 248 (6th Cir. 2006); In re Hentges, 350 B.R. 586 (Bankr. N.D. Okla. 2006);

20    . . .

---

[10] See In re Crown Sportswear, Inc., 575 F.2d 991 (1st Cir. 1987); Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.), 370 F.R. 236 (B.A.P. 9th Cir. 2007) (affirming bankruptcy court's objective, reasonable person standard for determining bad faith); Bock Transp., Inc. v. Paul (In re Bock Transp., Inc.), 327 B.R. 378 (B.A.P. 8th Cir. 2005); In re Midwest Processing Co., 41 B.R. 90 (Bankr. D.N.D. 1984).

[11] See In re Nordbrock, 772 F.2d 397 (8th Cir. 1985); In re Tichy Elec. Co., 332 B.R. 364 (Bankr. N.D. Iowa 2005) (petitioning union trust funds filed in bad faith because they filed solely to collect debts owed to them); In re Westerleigh Dev. Corp., 141 B.R. 38 (Bankr. S.D.N.Y. 1992); In re F.R.P. Indus., 73 B.R. 309 (Bankr. N.D. Fla. 1987).

[12] See In re United States Optical, Inc., 1993 U.S. App. LEXIS 6960 (4th Cir. Apr. 1, 1993) (unpublished); Levey v. Kesser Cleaners Corp., 2007 U.S. Dist. LEXIS 54738 (E.D.N.Y. July 27, 2007) (adopting Rule 9011 standard); In re Mylotte, David & Fitzpatrick, 2007 Bankr. LEXIS 2375 (Bankr. E.D. Pa. July 12, 2007) (current trend is to adopt standard of bad faith that incorporates both objective and subjective elements; In re Petralex Stainless, Ltd., 78 B.R. 738 (Bankr. E.D. Pa. 1987).

- 13 -

1    In re Mundo Custom Homes, Inc., 179 B.R. 566 (Bankr. N.D. Ill. 1995). There is clearly some

2    overlap among the tests.

3         The test that has gained the greatest acceptance is that which combines the objective and

4    subjective elements, namely the Rule 9011 standard. See In re K.P. Enter., 135 B.R. 174 (Bankr.

5    D. Me. 1992). Answering one or more of the first three questions in the negative and the fourth

6    question in the affirmative can lead to dismissal of the petition: (i) Did the petitioning creditor

7    make a reasonable inquiry into relevant facts and pertinent law before commencing the

8    involuntary filing; (ii) Was the involuntary filing well grounded in fact; (iii) Was the involuntary

9    filing warranted by existing law or by a good faith argument for change in the current law; and

10   (iv) Was the filing undertaken for an improper purpose such as harassment, delay or an effort to

11   increase costs to obtain advantage? See 2 Collier on Bankruptcy ¶ 303.16[1].

12        Considering the variety of available tests and in view of the treatment of other issues of

13   good and bad faith under the Code, the Rule 9011 test is best suited to resolving the issues,

14   although the addition of subsection (l) changes the calculus for cases involving fraudulent

15   statements in cases filed against individual debtors. See 2 Collier on Bankruptcy ¶ 303.16[1].

16   The "smell" test is not as predictable and is harder to apply consistently. The other tests, while

17   capturing part of the inquiry, can miss key aspects of a situation. Id.

18        The complexities of determining what constitutes bad faith under section 303(b) are

19   clarified somewhat by subsection (l). Id. This section provides that if dismissal occurs when a

20   petition is false or contains materially false, fictitious or fraudulent statements with respect to an

21   individual debtor, additional consequences flow. Id. The identification of this specific

22   subcategory of acts—namely, falsity or materially false, fictitious or fraudulent statements—

23   signals that these acts are evidence of bad faith. Id.

24        Depending on the circumstances of the case, the fact that the debtor and petitioning

25   creditors are engaged in state court litigation does not, in and of itself, support a finding of bad

26   faith,[13] especially where the filing in the latter instance may be necessary to preserve assets or

27   _____

28   [13] See Subway Equip. Leasing Corp. v. Sims (In re Sims), 994 F.2d 210, 222 (5th Cir. 1993), where putative debtor
     contended that bad faith was demonstrated by the fact that, prior to filing the petitions, the creditors had filed suit

SANTORO, DRIGGS, WALCH
KEARNEY, HOLLEY & THOMPSON

SDW

- 14 -

07906-01.001/599898.doc

1  because of the condition of the debtor's business. See 2 Collier on Bankruptcy ¶ 303.16[2] (15th

2  ed. rev. 2009).  Bad faith can be evidenced by filing a case solely to create havoc, as a form of

3  protest or to harass public officials or private individuals.[14]  Filing an involuntary petition solely

4  to protect one's own interest also evidences bad faith.[15]  The examples of bad faith noted by

5  courts reveal their concern over improper involuntary cases. As expressed by one court, an

6  allegation of bankruptcy can "leave a permanent scar even if properly dismissed." See In re

7  Dino's, Inc., 183 B.R. 779, 783 (S.D. Ohio 1995).

8      In *In re VII Holdings Co.*, 362 B.R. at 665, a case remarkably similar to the instant case,

9  the bankruptcy court dismissed an involuntary Chapter 7 petition commenced by a mortgage

10  interest holder relating to a single asset real estate case based upon a finding that the petitioning

11  creditor filed the involuntary petition to frustrate the foreclosure sale. Id. The foreclosure was

12  halted twice by involuntary bankruptcy petitions. Id. The first time in 2001, an involuntary was

13  commenced immediately before the foreclosure of the property. Id. The automatic stay was

14  terminated five years later, and the foreclosure sale was rescheduled. Id.  The second time,

15  immediately before the foreclosure sale in 2006, an involuntary bankruptcy case was filed again

16  for the second time. Id. The putative debtor argued that the involuntary bankruptcy case should

17  be dismissed because it was commenced in bad faith, serving no purpose other than to frustrate

18  repeated foreclosure attempts. Id. at 666;  See also, *Macke Int'l Trade, Inc.*, 370 B.R. at 241

19

—————————————— (continued)

20  against them in state court, and they had asserted counterclaims against the creditors. The Court found that the mere
filing of such counterclaims against the creditors is insufficient to demonstrate the existence of a bona fide dispute,

21  and thus does not support a determination that the creditors filed in bad faith. See also In re Everett, 178 B.R. 132
(Bankr. N.D. Ohio 1994).

22  [14] See In re John Richards Homes Bldg. Co., 439 F.3d at 256-57 (creditor filed petition with wrongful intent to
intimidate debtor into settlement and when that failed, to damage and destroy his reputation); In re Loe, 2007 Bankr.

23  LEXIS 1146 (involuntary petition filed in bad faith and dismissed when petitioning creditor, convicted of first
degree murder and a guest of the Florida Department of Corrections, filed involuntary petition against prosecuting

24  attorney); In re Kennedy, No. 02-26100-MDM (Bankr. E.D. Wis. May 21, 2002).

25  [15] See In re VII Holdings Co., 362 B.R. 663, 667 (Bankr. D. Del. 2007) (creditor filed involuntary petition to
frustrate mortgagees' foreclosure attempts); In re St. Marie Dev. Corp., 334 B.R. 663, 673 (Bankr. D. Mont. 2005)

26  (even if petitioners had standing to file, petition was filed in bad faith: former insiders filed to protect their own
interest, much of debt in question was debt incurred when they controlled debtor, and debt was in dispute); In re

27  Tichy Elec. Co., 332 B.R. 364, 377 (Bankr. N.D. Iowa 2005) (petitioning union trust funds filed in bad faith because
they filed solely to collect debts owed to them: they used bankruptcy process to obtain disproportionate advantage

28  over all other creditors and as weapon to satisfy their claims).

- 15 -

SANTORO, DRIGGS, WALCH
KEARNEY, HOLLEY & THOMPSON

SDW

1  (involuntary petition dismissed where simple two party dispute without bankruptcy purpose in

2  filing).

3

**B.    The Involuntary Petition Filed by BB&T Against R&S St. Rose Should be**
4  **Dismissed for Bad Faith.**

5       In the present case before the Court, grounds exist to dismiss the Involuntary Petition for

6  bad faith under the Ninth Circuit's totality of the circumstances test. See 11 U.S.C. § 305(a)(1);

7  see also In re Macke Int'l Trade, Inc., 370 B.R. at 247-48. BB&T exhibits bad faith on at least

8  two fronts.  First, the Involuntary Petition was filed by BB&T in furtherance of a two party

9  dispute concerning the priority of two deeds of trust encumbering the Property, which is the only

10  real property asset of R&S St. Rose. After a 10-day trial spanning a four (4) month period, the

11  trial court granted a Rule 52 Motion and ruled that BB&T had failed to meet its burden of proof

12  in establishing that it was the assignee of a $43M DOT  from the FDIC, as receiver for Colonial

13  Bank. As a result of the ruling, the trial court found that the $43M DOT was junior in priority to

14  a $12M DOT recorded by St. Rose Lenders.  BB&T is attempting to use the involuntary

15  bankruptcy petition process to collaterally attack and circumvent the trial court ruling regarding

16  the alleged assignment by arguing that BB&T is a qualified petitioning creditor.

17       Second, BB&T is also attempting to use the involuntary bankruptcy petition process to

18  stay the foreclosure sale by St. Rose Lenders scheduled for June 1, 2010, and thus avoid the

19  posting of a bond, pending appeal of the trial court's ruling. After the trial court issued its ruling,

20  BB&T, through its counsel, Mr. Doug Gerrard, Esq., immediately made an oral motion for a stay

21  of the St. Rose Lenders' foreclosure pending the outcome of an appeal and for a Rule 54(b)

22  certification of the trial court's ruling. After some discussion, Mr. Gerrard advised the trial court

23  that he would file a motion to dismiss the remaining claims for relief in order to pave the way for

24  an appeal of the Rule 52 Motion as well as a motion to stay the St. Rose Lenders' foreclosure

25  pending appeal.  This then led to a discussion between counsel and the court regarding the

26  continued imposition of the temporary restraining order for the statutory 15-day time period after

27  entry of the findings of fact, conclusions of law and order granting the Rule 52 motion.

28  . . .

- 16 -

1    Thereafter, on or about April 28, 2010, BB&T filed a Voluntary Motion to Dismiss and

2    Motion to Stay Foreclosure in order to pave the way for the filing of an appeal of the trial court's

3    order granting the Rule 52 Motion.  At the hearing held on May 4, 2010, the trial court granted

4    BB&T's Motion to Dismiss, but denied its Motion to Stay Foreclosure to enjoin the St. Rose

5    Lenders foreclosure sale scheduled for June 1, 2010.  After the trial court denied BB&T's

6    Motion to Stay Foreclosure of the St. Rose Lenders foreclosure sale, and while the parties were

7    in the process of preparing findings of fact, conclusions of law and judgment on the Rule 52

8    Motion, BB&T filed the involuntary petition under Chapter 7 of the Bankruptcy Code against

9    R&S St. Rose.  See *Involuntary Petition* [DKT 1].  Of course, the filing of the Involuntary

10   Petition had the affect of staying the scheduled foreclosure sale without BB&T prevailing on an

11   injunctive relief motion or posting a bond pending appeal.

**C.    Upon Dismissal of the Involuntary Petition, The Movants are  Entitled to Attorneys'
        Fees and Costs for Bad Faith Filing Under Section 303(i).**

14   In the event the Bankruptcy Court dismisses the involuntary petition for bad faith, cause

15   also exists for the Court to order BB&T to pay movants their attorney's fees and costs.. See In re

16   Miles, 430 F.3d 1083, 1086 (9th Cir. 2005).  Congress created involuntary bankruptcy

17   proceedings to enable creditors who are unable to extract preferences or unequal transfers from

18   distressed debtors to achieve equitable treatment. Id.  If a petitioning creditor filed the petition in

19   bad faith, the court may award the debtor any damages proximately caused by the filing of the

20   petition. Id. at 1094.

21   In this case, BB&T did not file the involuntary bankruptcy case to further any legitimate

22   bankruptcy purposes such as enabling creditors who are unable to extract preferences or unequal

23   transfers from distressed debtors to achieve equitable treatment. In this case, there is no

24   legitimate bankruptcy goal furthered by the Involuntary Petition.  Therefore, an award of fees

25   and costs against BB&T for bringing the instant Motion is appropriate.  The movants will

26   provide a supplemental declaration prior to the hearing on the Motion detailing the legal fees and

27   costs incurred in dismissing this wrongfully filed Involuntary Petition.

28

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

07906-01.001/599898.doc

**D.**    **If the Court is not Willing to Dismiss the Involuntary Petition for Bad Faith, in the Alternative, the Court Should Abstain from Exercising Jurisdiction Under Section 305(a)(1) and Dismiss the Involuntary Petition.**

In the event the Court is not willing to dismiss the Involuntary Petition for bad faith, the Court should nevertheless abstain pursuant to 11 U.S.C. § 305(a) from exercising jurisdiction over this case. A bankruptcy court has jurisdiction over an involuntary case pursuant to 11 U.S.C. § 303. See Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.), 370 B.R. 236, 246 (B.A.P. 9th Cir. 2007). Notwithstanding the bankruptcy court's jurisdiction, Section 305(a)(1) provides that the bankruptcy court may dismiss an involuntary case, if the interests of creditors and the debtor would be better served by dismissal. Id. (citing Eastman v. Eastman (In re Eastman), 188 B.R. 621, 624 (B.A.P. 9th Cir. 1995) (a pending chapter 7 case could be dismissed under § 707(a) or § 305(a)(1)); In re Williamsburg Suites, Ltd., 117 B.R. 216, 218 (Bankr.E.D.Va.1990) (dismissal pursuant to § 305 was appropriate even where petitioning creditors established a case for an involuntary bankruptcy); D. Epstein, S. Nickles & J. White, Bankruptcy § 2-5g (1992) ("[A]n involuntary petition that satisfies all of the requirements of section 303 can be dismissed under section 305...."); 2 Collier on Bankruptcy ¶ 305.LH[2], at 305-12 to 305-13 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005) (Congress intended § 305 to apply primarily as a "mechanism to dismiss involuntary cases filed by dissident creditors who seek to disrupt ongoing negotiations between the debtor and its creditors.")).

On its face, Section 305(a)(1) offers no guidance to the Court in determining whether the interests of creditors and the debtor warrant dismissal of an involuntary bankruptcy case. See In re International Zinc Coatings & Chemical Corp., 355 B.R. at 82 (citing In re Spade, 258 B.R. 221, 228 (Bankr. D.Colo. 2001)). Therefore, whether a case should be dismissed under Section 305(a)(1) is a discretionary decision to be made on a case-by-case basis, looking to the individual facts of each case. Id. (citation omitted); see also In re Spade, 258 B.R. at 231.

It is well established that the use of an involuntary bankruptcy filing is an improper method of resolving a two-party dispute. See In re ELRS Loss Mitigation, LLC, 325 B.R. at 634; see also In re Jr. Food Mart of Arkansas, Inc., 241 B.R. 423, 426 (Bankr. E.D.Ark. 1999)

- 18 -

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1    (holding that an involuntary case which is essentially a two-party dispute may be dismissed).  On

2    a broader basis, in making this fact-sensitive determination, courts consider a wide range of

3    factors, typically including the following factors:

4                    (1) the presence of unsettled issues of non-bankruptcy law;
                     (2) the availability of another forum to decide those issues;
5                    (3) economy and efficiency of administration;
                     (4) any prejudice to the parties; and
6                    (5) the purpose of the bankruptcy.

7    See In re International Zinc Coatings & Chemical Corp., 355 B.R. at 82 (citations omitted).

8    Other factors sometimes considered include the nature of the estate's assets and the motivations

9    of the parties. Id. (citing In re Spade, 258 B.R. at 231; In re Jr. Food Mart of Ark., Inc., 241 B.R.

10   423, 426 (Bankr. E.D.Ark. 1999)).    Courts have also conducted a "cost-benefits" test to

11   bankruptcy versus state court jurisdiction in the Section 305 abstention analysis.  See, e.g., In re

12   Nina Merchandise Corp., 5 B.R. 743 (Bankr. S.D.N.Y. 1980).

13         While dismissal under Section 305(a)(1) is considered an extraordinary remedy, see In re

14   Edwards, 214 B.R. 613, 620 (B.A.P. 9th Cir. 1997), and is meant to be the exception rather than

15   the rule, courts have repeatedly held that dismissal is appropriate when it will best serve the

16   interests of the debtor and creditors. See In re International Zinc Coatings & Chemical Corp.,

17   355 B.R. at 82 (citing In re Fortran Printing, Inc., 297 B.R. 89, 94 (Bankr. N.D. Ohio 2003)).

18   Section 305 abstention orders are not subject to review by the circuit courts of appeal. See In re

19   Spade, 258 B.R. at 230.    Before a court may abstain from exercising jurisdiction over an

20   otherwise proper case, the court must make specific and substantiated findings that the interests

21   of the creditors and the debtor will be better served by dismissal.  See In re Spade, 258 B.R. at

22   225; See In re Jr. Food Mart of Arkansas, Inc., 241 B.R. 423, 426 (Bankr. E.D.Ark. 1999).

23         In the instant case, the applicable factors support abstention and dismissal of the

24   Involuntary Petition pursuant to Section 305(a)(1).  First, as in Spade, supra, BB&T was not

25   motivated by fairness for all creditors; rather, the involuntary petition was filed by BB&T in

26   furtherance of a two party dispute, to collaterally attack and circumvent the trial court's ruling

27   regarding the alleged assignment by asserting that BB&T is a qualified petitioning creditor; and

28   . . .

- 19 -

1    to stay a pending foreclosure sale without prevailing on an action for injunctive relief or posting

2    bond pending appeal.

3         Next, economy and efficiency of administration support dismissal.   The Involuntary

4    Petition was filed by BB&T after ten days of trial over a four month period and after the trial

5    court issued its ruling, but before findings of fact and conclusions of law were submitted to the

6    court.  BB&T subsequently dismissed all remaining claims for relief in order to pave the way for

7    a final and appealable judgment.  All that is now left is for BB&T to pursue its threatened appeal.

8    Filing the Involuntary Petition adds nothing to the process, but delay.  There is no equity in the

9    Property for R&S St. Rose and since the Involuntary Petition was commenced under Chapter 7,

10   BB&T obviously does not believe that the Property is necessary for an effective reorganization.

11   Even assuming that the Involuntary Petition was granted, there is no estate for a Chapter 7

12   trustee to administer.  Regarding the next factor, prejudice to the parties, BB&T is not prejudiced

13   in the least by dismissal of the Involuntary Petition.  All of its rights on appeal are preserved and

14   there are state law procedures for enjoining the scheduled foreclosure sale if such relief is

15   meritorious.  The only conceivable reasons for filing the Involuntary Petition were improper.

16        Finally, the interests of the creditors and R&S St. Rose would be better served by

17   dismissal.   There is simply no legitimate bankruptcy purpose promoted by the Involuntary

18   Petition.  All of the noticed parties are participants in the state court action.  The trial court has

19   determined priority of the recorded deeds of trust.

20   . . .

21   . . .

22   . . .

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

- 20 -

07906-01.001/599898.doc

III    **CONCLUSION**

Based upon the foregoing, this Court should dismiss the Involuntary Petition for bad faith with an award of attorney's fees and costs to Movants for bringing the Motion.  In the alternative, this Court should abstain from exercising its jurisdiction and dismiss the involuntary petition pursuant to 11 U.S.C. § 305(a)(1).

Dated this 25th day of May, 2010.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

*Richard F. Holley*

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:702/791-0308
Facsimile: 702/791-1912
*Attorneys for Forouzan, Inc. RPN, LLC, Saiid Forouzan Rad, and Phillip Nourafchan*

BAILUS COOK & KELESIS, LTD.


     /s/ Julie Sanpei
Julie Sanpei, Esq. (NV Bar No. 5479)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:702/385-3788
Facsimile: 702/737-7712
*Attorneys for R&S St. Rose, LLC*

- 21 -

07906-01.001/599898.doc

1

## CERTIFICATE OF SERVICE

2      I hereby certify that I am an employee of Santoro, Driggs, Walch, Kearney, Holley &

3   Thompson, and that on the _____ day of May, 2010, I caused to be served a true and correct

4   copy of MOTION TO DISMISS INVOLUNTARY PETITION in the following manner:

5      ☒      (ELECTRONIC SERVICE)  Under Administrative Order 02-1 (Rev. 8-31-04) of

6   the United States Bankruptcy Court for the District of Nevada, the above-referenced document

7   was electronically filed on the date hereof and served through the Notice of Electronic Filing

8   automatically generated by that Court's facilities.

9      ☐      (UNITED STATES MAIL)  By depositing a copy of the above-referenced

10  document for mailing in the United States Mail, first class postage prepaid, at Las Vegas,

11  Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on

12  the date above written.

13     ☐      (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-

14  referenced document for overnight delivery via Federal Express, at a collection facility

15  maintained for such purpose, addressed to the parties on the attached service list, at their last

16  known delivery address, on the date above written.

17     ☐      (FACSIMILE)  That I served a true and correct copy of the above-referenced

18  document via facsimile, to the facsimile numbers indicated, to those persons listed on the

19  attached service list, on the date above written.

20

21                                    An employee of Santoro, Driggs, Walch,
                                       Kearney, Holley & Thompson

22

23

24

25

26

27

28

- 22 -

07906-01.001/599898.doc