1  Douglas D. Gerrard, Esq.
   Nevada Bar No. 4613
2  dgerrard@gerrard-cox.com
   Sheldon A. Herbert , Esq.
3  Nevada Bar No. 5988
   sherbert@gerrard-cox.com
4  Aaron B. Shumway, Esq.
   Nevada Bar No. 10759
5  ashumway@gerrard-cox.com
   **GERRARD, COX & LARSEN**
6  2450 St. Rose Pkwy., Suite 200
   Henderson, Nevada 89074
7  (702) 796-4000
   (702) 796-4848
8  *Attorneys for Branch Banking and*
   *Trust Company, successor by assignment*
9  *to Federal Deposit Insurance Corporation,*
   *as receiver of Colonial Bank*, N.A.

10

## UNITED STATES BANKRUPTCY COURT

11

## DISTRICT OF NEVADA

12

| In re: | Case No.    BK-S-10-18827-MKN |
|--------|-------------------------------|
| R & S ST. ROSE, LLC, | Involuntary Chapter 7 |
|           Debtor. | **BB&T'S OPPOSITION TO MOTION TO DISMISS INVOLUNTARY PETITION** |
|  | Date of Hearing:  June 23, 2010
Time of Hearing:  9:30 a.m. |

20     **BB&T'S OPPOSITION TO MOTION TO DISMISS INVOLUNTARY PETITION**

21         COMES NOW BRANCH BANKING AND TRUST COMPANY, successor by assignment

22 to Federal Deposit Insurance Corporation as receiver of Colonial Bank, N.A. ("BB&T"), by and

23 through its attorneys of record, GERRARD COX & LARSEN, and hereby files this Opposition To

24 R & S St. Rose, LLC ("R&S"), Forouzan, Inc. ("Forouzan"), RPN, LLC ("RPN"), Saiid Forouzan

25 Rad ("Rad"), and Phillip Nourafchan ("Nourafchan")'s Motion to Dismiss Involuntary Petition

26 ("Opposition").

27         This Opposition is made and based upon the papers and pleadings on file herein, the

28 Declaration of Aaron B. Shumway, Esq. filed concurrently herewith, the attached Memorandum of

*(sidebar, vertical text)* **GERRARD, COX & LARSEN**  2450 St. Rose Parkway, Suite 200  Henderson, Nevada 89074  (702) 796-4000

Points and Authorities, and any oral argument the Court wishes to entertain in the premises.

DATED this __9th__ day of June, 2010.

**GERRARD, COX & LARSEN**

__/s/ Douglas D. Gerrard, Esq.__
Douglas D. Gerrard, Esq.
Nevada Bar No. 4613
James E. Shapiro, Esq.
Nevada Bar No. 7907
Aaron B. Shumway, Esq.
Nevada Bar No. 10759
2450 St. Rose Pkwy., Suite 200
Las Vegas, Nevada 89119
*Attorneys for Branch Banking and*
*Trust Company, successor by assignment*
*to Federal Deposit Insurance Corporation,*
*as receiver of Colonial Bank*, N.A.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

The primary reason for dismissal of the involuntary petition that has been asserted by the Debtor and its affiliates is that the petition was filed in bad faith, in furtherance of a two-party dispute that should be litigated in state court. In this particular case, the petition should not be dismissed because only through bankruptcy court's exclusive powers and remedies will the insider-dealings and self-serving asset transfers by the principals of the Debtor be halted and exposed for any and all of its creditors, including BB&T. The petition serves to immediately halt the transfer and further waste of assets by insiders Rad and Nourafchan.

This is not a two party case. It involves multiple parties, entities, and transactions with Rad and Nourafchan at the center of it all. Relief under the bankruptcy code is exactly what is required in order to determine exactly what kind of insider dealings Rad and Nourafchan have committed in an attempt to secure and prefer themselves to any of their other creditors.

As set forth below, BB&T is a qualified creditor of the Debtor attempting to regain millions of dollars from the Debtor's estate. Through bankruptcy, a Trustee should be able to hold insiders Rad and Nourafchan accountable for the money that has been funneled through their web of

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

1  entities, including the Debtor entity, and further prevent them from squandering any resources and

2  assets still in their possession.  Therefore, relief under the bankruptcy code is precisely what is

3  required to stop Rad and Nourafchan as the alter-egos of the Debtor and its affiliates from

4  preferring themselves, family members and friends over creditors such as BB&T.

5      Accordingly, the Motion to Dismiss Involuntary Petition ("Motion") should be denied in

6  order for a Trustee to commence an independent investigation as to R&S and its affiliated entities.

**II.**

**STATEMENT OF FACTS**

8

9  **A.**    **R&S's Purchase Of The Property**

10      Rad and Nourafchan formed R&S for the specific purpose of land-banking thirty-eight (38)

11  acres of real property located at St. Rose Parkway and Spencer Road in Henderson, Nevada. (the

12  "Property").  See Motion at ¶1.  To shield themselves from liability, Rad and Nourafchan used

13  multiple layers of legal entities.  The managing entities of R&S are Forouzan and RPN.  Rad and

14  Nourafchan are the principals of Forouzan and RPN, respectively.  See Declaration of Holley at ¶4

15  Forouzan and RPN are the managing members of numerous entities, including R&S; R & S St.

16  Rose Lenders, LLC ("R&S Lenders"); R & S Investment Group, LLC ("R&S Investment").  Id. at

17  ¶4-¶6; see also Motion at ¶3.  On or about August 26, 2005, Rad and Nourafchan used R&S to

18  purchase the Property for approximately $45,131,414.11.  Rad and Nourafchan purchased the

19  Property with the intention of flipping it one year later by selling it to Centex Homes, a residential

20  real estate developer for $54,102,000.00.  See Motion at ¶2.  Had they been able to sell the Property

21  to Centex Homes as planned, R&S would have made a handsome profit of nearly nine million

22  dollars ($9,000,000.00) just by holding the Property for a little over one year.

23      In their Motion, Rad and Nourafchan claim that R&S purchased the Property by using funds

24  from three different sources: (1) a $29,305,250.00 loan from Colonial Bank, N.A.[1] (the "First

25

26      [1]On August 14, 2009 the Alabama State Banking Department closed Colonial Bank and appointed
the Federal Deposit Insurance Corporation ("FDIC") as its receiver.  That same day, the FDIC entered into a
27  Purchase and Assumption Agreement with BB&T wherein BB&T purchased approximately $22 billion of
Colonial's $25 billion in assets.  The FDIC retained the remaining assets.  A true and correct copy of the
28  Purchase and Assumption Agreement is attached to the Shumway Declaration as Exhibit "C."

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

Colonial Loan"); (2) an $8,100,000.00 non-refundable deposit from Centex Homes; and (3) a $12,000,000.00 loan from R&S Lenders (the "R&S Lenders Loan"), another entity wholly owned and controlled by Rad and Nourafchan.  See Motion at ¶3.  A true and correct copy of the First Colonial Loan is attached to Shumway Declaration as Exhibit "D."  While the $29,305,250.00 First Colonial Loan and the $8,100,000.00 non-refundable deposit from Centex Homes are not at issue herein, the $12,000,000.00 R&S Lenders Loan is at the very heart of this involuntary bankruptcy and needs to be addressed by this Court as set forth below.

**B.    R&S Lenders And The $12,000,000.00 R&S Lenders Loan**

With the $29,305,250.00 First Colonial Loan and another $8,100,000.00 from Centex Homes, Rad and Nourafchan were still in need of additional funds to meet the $45,131,414.11 purchase price of the Property.  In their Motion, Rad and Nourafchan indicate that they borrowed approximately $12,000,000.00 from R&S Lenders to purchase the Property.  See Motion, ¶3.  R&S Lenders is another entity wholly owned and operated by Rad and Nourafchan.  Id.  What Rad and Nourafchan do not explain in their Motion is how they, as R&S Lenders, obtained funds to lend to themselves or how R&S Lenders could have loaned R&S $12,000,000.00 to purchase the Property when R&S Lenders was not formed until **after** they purchased the Property.  In his deposition testimony, Rad testified with regard to his entity known as R&S Lenders as follows [2]:

Q.    When did you open up the St. Rose Lenders entity?

A.    I think after the closing of the escrow.

Q.    Why did you wait until then?

A.    Because at the time that we were introduced to do the deal
until the time that we closed the deal was a very short time
and we weren't sure whether we were going to have the
number of people – lenders in order to do the deal.

---

[2]Rad was deposed on or about October 14, 2009 in Clark County District Court Case No. A574852 filed by Robert E. Murdock, Esq. ("Murdock") and Eckley M. Keach, Esq. ("Keach") alleging breach of contract, unjust enrichment, fraud and requesting, among other relief, that a receiver be appointed and for the court to make a determination as to alter-ego status.

1    A true and correct copy of the October 14, 2009, Deposition of Rad is attached to the Shumway

2    Declaration as Exhibit "G."  Simply put, R&S Lenders was formed by Rad and Nourafchan after

3    the fact as a sham entity used to further Rad and Nourafchan's own interests and self-dealing to the

4    detriment of all others.

5        The real source of the more than $12,000,000.00 that Rad and Nourafchan raised to

6    purchase the Property did not come from the sham entity of R&S Lenders; rather, the source of the

7    money was wealthy family members, friends, and acquaintances[3] (hereinafter referred to as

8    individual "lenders") that Rad and Nourafchan and/or their agent solicited to participate in what

9    they called an "investment opportunity."  Compare Motion, ¶3 *with* Declaration of Rad ¶12-13,

10   attached to the Shumway Declaration as Exhibit "J" and incorporated herein by this reference.  As

11   R&S Lenders was not formed until **after** the purchase of the Property, Rad and Nourafchan

12   funneled the monies from these individual lenders through one of the R&S Investment Group

13   entities.  By way of example, an August 2005 bank statement for R&S (the "Bank Statement")

14   shows more than ten million ($$10,000,000.00) being received by R&S directly from individual

15   investors.  This money was received by R&S before any loan was allegedly made by R&S Lenders,

16   yet it comprises the money allegedly loaned to R&S by R&S Lenders.  A true and correct copy of

17   the Bank Statement is attached to the Shumway Declaration as Exhibit "I."  There is no evidence of

18   any money being actually provided by R&S Lenders to R&S.  Again, this sham loan transaction is

19   indicative of the insider dealing which Rad and Nourafchan tried to cover up by creating a sham,

20   alter-ego entity and claiming the loan came from such entity.  It was actually just another

21   mechanism for Rad and Nourafchan to funnel more money to themselves while attempting to

22   insulate themselves from liability for repayment of the money.

23   / / /

24   / / /

25

26       [3]Robert E. Murdock, Esq. ("Murdock") and Eckley M. Keach, Esq. ("Keach") are two of the thirty-
     seven individuals that loaned money to Rad and Nourafchan.  On or about November 3, 2008, Murdock and
27   Keach filed a Complaint against Rad, Nourafchan, Forouzan, RPN, R&S, R&S Lenders, and R&S
     Investment.  A true and correct copy of Murdock and Keach's Second Amended Complaint is attached to the
28   Shumway Declaration as Exhibit "B."

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

In his deposition testimony, Rad confirmed that the money he received from individual lenders flowed into one of the R&S Investment Group entities but not R&S Lenders:

> Q. So the money flowed into one of the R & S Investment Group entities, but it didn't flow automatically into the R & S Investment Group St. Rose Lenders; correct?
>
> A. Correct.
>
> Q. After you opened the St. Rose Lenders entity, did you then move the money from whatever entity the money was in to the St. Rose Lenders, LLC bank account?
>
> A. No sir.
>
> Q. When did you open a bank account for St. Rose Lenders, LLC?
>
> A. I think, I'm not a hundred percent sure, I think in the middle of 2008 or 2007. Either 2007 or 2008, I'm not quite sure.

See Deposition of Rad attached to the Shumway Declaration as Exhibit "G," pg. 29 lns. 7-21; see also Second Amended Compaint, ¶38-42 attached to the Shumway Declaration as Exhibit "B" (Murdock alleges he was sent instructions to wire his funds to R&S Investment while Keach alleges he was sent instructions to wire his funds to R&S). As set forth above, Rad's own testimony confirms that R&S Lenders did not even exist at the time R&S purchased the Property with bank accounts not being opened until sometime in 2007 or 2008, two to three years after the purchase of the Property.

Of critical importance is the fact that at his deposition, Rad also testified that he and Nourafchan were able to raise a lot more money than the $12,000,000.00 they used to purchase the Property. All in all, Rad testified that they received over $19,200,000.00 from the individual lenders participating in this "investment opportunity." See Deposition of Rad attached to the Shumway Declaration as Exhibit "G," pg. 30-31. At his deposition Rad produced a spreadsheet of individual lenders ("List of Investors") representing the source of $18,560,100.00 of the more than $19,200,000.00 he and Nourafchan raised. A true and correct copy of the List of Investors is attached to the Shumway Declaration as Exhibit "H." As only $12,000,000.00 of these funds was allegedly used to purchase the Property, there remains huge questions as to the whereabouts of the more than $7,200,000.00 of remaining funds. An accounting for these monies by a bankruptcy

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

6

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

1    Trustee must be made immediately.  A bankruptcy Trustee must determine if Rad and Nourafchan

2    are still in possession of these funds, if they have been transferred to Rad and Nourafchan or one of

3    their other insider, sham entities, and if such transfers can be avoided and recovered by the Trustee

4    as fraudulent or preferential transfers.

5         The manner in which Rad and Nourafchan secured the $12,000,000.00 used to purchase the

6    Property also indicates Rad and Nourafchan's insider dealing and disregard for creditors other than

7    themselves.  Rather than secure each individual investor with a deed of trust that was recorded

8    against the Property, Rad and Nourafchan recorded a promissory note and $12,000,000.00 Second

9    Short Form Deed of Trust and Assignment of Rents (the "R&S Lenders DOT") executed on behalf

10   of R&S in favor of Rad and Nourafchan's newly created entity, R&S Lenders.  A true and correct

11   copy of the R&S Lenders DOT is attached to the Shumway Declaration as Exhibit "F."

12   Accordingly, in the event that Rad and Nourafchan were unable to make the promised interest

13   payments to the individual lenders, the lenders had no interest in the Property to foreclose upon,

14   Rad and Nourafchan were the only ones that held an interest in the Property.  Rad and Nourafchan

15   insulated themselves from liability for the money they borrowed from the investors by making R&S

16   Lenders responsible for repayment of the loans.  Despite Rad and Nourafchan's efforts to claim that

17   the Property is owned by one of their entities, the sham entity is nothing more than a legal fiction

18   and an extension of Rad and Nourafchan.

19        In sum, Rad and Nourafchan used the $29,305,250.00 First Colonial Loan as well as money

20   they solicited from individual investors to purchase the Property – raising millions of dollars more

21   than what was required to purchase the Property.  After they purchased the Property, Rad and

22   Nourafchan then secured themselves (rather than their investors) by executing a deed of trust in

23   favor of another of their sham entities, R&S Lenders.  Accordingly, Rad and Nourafchan became

24   both the borrower and the lender.

25        Rad and Nourafchan's insider dealings and transfer of funds, without regard to corporate

26   formalities in order to secure themselves rather than their lenders, is precisely the reason why this

27   Court should appoint a Trustee to investigate where these funds are and if they are recoverable for

28   the benefit of the bankrupt estate.

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

**C.    The $43,980,000.00 Colonial Construction Loan**

By August of 2007, Rad and Nourafchan were still in possession of the Property, and their attempts to sell the Property had failed.  Therefore, Rad and Nourafchan formulated a plan to develop the Property and believed that by selling off improved lots they would still be able to meet R&S's obligations and not default on the $29,305,250.00 First Colonial Loan and lose the Property to foreclosure.

Colonial agreed to refinance the Property with a new $43,980,000.00 construction loan (the "Construction Loan") secured by a first priority deed of trust, that would serve to refinance the First Colonial Loan as well as provide construction funds for improvements to the project.  A true and correct copy of the Construction Loan is attached to the Shumway Declaration as Exhibit "E."

On or about July 27, 2007, the Construction Loan closed.  The First Colonial Loan was paid off and a new $43,980,000.00 first priority construction deed of trust (the "Construction Loan DOT") was put in its place to secure the Construction Loan.  However, R&S Lenders did not release or reconvey the R&S Lenders DOT as anticipated and instructed by Colonial.  As such, the $43,980,000.00 Construction Loan DOT was recorded after the $12,000,000.00 R&S Lenders DOT.

**D.    The State Court Litigation**

Lien priority as to the $43,980,000.00 Construction Loan DOT and the $12,000,000.00 R&S Lenders DOT was the subject matter of an expedited proceeding in Clark County District Court Case No. A574852.[4]  BB&T sought equitable subrogation/replacement to the extent that the Construction Loan funds were used to pay off the First Colonial Loan.  Rad, Nourafchan, Forouzan, RPN, R&S, R&S Lenders, R&S Investment, Murdock, and Keach all argued against equitable subrogation/replacement so that the $12,000,000.00 R&S Lenders DOT would remain senior to the $43,980,000.00 Construction Loan DOT.  See Declaration of Aaron B. Shumway, Esq. filed

---

[4]Rad and Nourafchan contended in the state court litigation that they never agreed to release or reconvey the second position R&S Lenders DOT.  BB&T as successor in interest by assignment to the FDIC as receiver of Colonial contended that Colonial would have never refinanced the First Colonial Loan and released its first position deed of trust on the Property had it known that Rad and Nourafchan would refuse to reconvey the R&S Lenders DOT.

1    concurrently herewith in support of this Opposition and incorporated herein by this reference.

2            Due to the Court's calendaring schedule, the trial lasted approximately 10 days over a four

3    (4) month period between January and April of 2010.  Id.  Prior to the close of BB&T's case-in-

4    chief, Rad, Nourafchan, Forouzan, RPN, R&S, R&S Lenders, R&S Investment **never** raised the

5    issue of standing.  The court **never** indicated BB&T's standing was at issue.  And standing was **not**

6    one of the issues that the Court agreed to advance for trial on the merits.  Id.  However,

7    immediately after BB&T closed its case-in-chief, the other parties then brought N.R.C.P. 52(c)

8    motions for a judgment on partial findings by the court.  The parties argued that BB&T lacked

9    standing because the Purchase and Assumption Agreement was ambiguous and failed to show that

10   the loan at issue had been transferred to BB&T.

11           While the Purchase and Assumption Agreement between the FDIC and BB&T was entered

12   into evidence at the time of trial, the Court stated that it could not find that an assignment of the

13   Construction Loan had been made under the agreement.  Specifically, the district court stated that:

14           "Exhibit 183 [the Purchase and Assumption Agreement] is internally
             inconsistent and is incomplete.  It prevents the court from making a
15           finding that an assignment has occurred of the loan that is at issue."

16   A true and correct copy of the Trial Transcript, Day 9, pgs. 24-25 is attached to the Shumway

17   Declaration as Exhibit "M."    Although BB&T moved the district court to substitute in and/or join

18   the FDIC or the real party in interest in order to reach the issue of priority on its merits, the district

19   court, without explanation, refused to allow the FDIC to be joined as the real party in interest.

20   **E.**     **Involuntary Petition Of Bankruptcy**

21           Before the district court had filed a final order with respect to the state court litigation,

22   BB&T filed an involuntary petition of bankruptcy against the Debtor, R&S, on or about May 13,

23   2010.  A true and correct copy of the Involuntary Petition is attached to the Shumway Declaration

24   as Exhibit "N."  Although the Debtor contends that the involuntary petition was filed in bad faith,

25   in light of Rad and Nourafchan's insider dealings it is now more than clear to BB&T that the best

26   way to preserve its interest in the Property is through the exclusive powers of a bankruptcy court

27   and the appointment of a Trustee to thoroughly investigate the actions of Rad and Nourafchan and

28   to stop any further dissipation of estate funds.

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

Regardless of what happens with respect to the dispute regarding priority, BB&T will have a large, unsecured claim upon foreclosure of the Property. As set forth below, the most current estimate of the fair market value of the Property is approximately $23,555,000.00. See Motion at ¶44- ¶45. The Debtor, R&S, is indebted to BB&T and the individual lenders (making up the $12,000,000.00 allegedly secured by the R&S Lenders DOT) for a minimum of approximately $45,555,000.00, resulting in an unsecured deficiency in the neighborhood of $22,000,000.00. See id. There is more than $7,200,000.00 that Rad and Nourafchan received which must be accounted for, and a bankruptcy Trustee is needed to ascertain where this money is and to locate and avoid inappropriate transfers of this money to insiders. There is a reason why Rad and Nourafchan do not want a Trustee looking at their books and investigating their related entities – their insider dealings would be thwarted by the Trustee and any preferential, fraudulent, or illegal transfers for their benefit would be brought back into the bankruptcy estate.

**III.**

**STATEMENT OF AUTHORITIES**

**A.    LEGAL STANDARD FOR DISMISSAL OF INVOLUNTARY PETITION FOR BAD FAITH.**

There is a presumption of good faith in favor of the petitioning creditor, and the burden is on the debtor to show by a preponderance of the evidence that the filing is in bad faith. In re Bayshore Wire Products Corp., 209 F.3d 100 (2nd Cir. 2000); In re Alta Title Co., 55 B.R. 133 (Bankr. D. Utah 1985); In re E.S. Professional Servs., Inc., 335 B.R. 221, 226 (Bankr. S.D. Fla. 2005). The fact that the debtor and petitioning creditor are involved in state court litigation does not, in and of itself, support a finding of bad faith. See In re Sims, 944 F.2d 210, 222 (5th Cir. 1993); see also In re Everett, 178 B.R. 132 (Bankr. N.D. Ohio 1994).

Since the Bankruptcy Code does not define bad faith, courts wrestle with its definition. One line of cases holds that bad faith exists when a petition is "ill advised or motivated by spite, malice or a desire to embarrass the debtor." Camelot, Inc. v. Hayden, 30 B.R. 409, 411 (E.D. Tenn. 1983), citing 2 *Collier on Bankruptcy* 303.12 (15th ed. 1979). Another line of authority looks to whether the creditor's actions were an improper use of the Bankruptcy Code as a "substitute for customary

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

collection procedures." See In re Advance Press & Litho, Inc., 46 B.R. 700, 703 (D. Colo. 1984).

In the Ninth Circuit, "[w]hether a party acted in bad faith is essentially a question of fact." In re

Wavelength, Inc., 61 B.R. 614, 619-620 (B.A.P. 9th Cir. 1986). "Bad faith should be measured by

an 'objective test' that asks 'what a reasonable person would have believed.'" Id. citing In re

Grecian Heights Owners' Ass'n, 27 B.R. 172, 173 (Bankr. D. Ore. 1982). The "reasonable person"

test focuses not on the subjective intent of the petition creditor, but on whether a reasonable person

would find the action of the petition creditor to be in bad faith. Bayshore, 209 F.3d at 105-106,

citing In re Wavelength, Inc., 61 B.R. 614, 620; see also In re Hentges, 351 B.R. 758 (Bankr. N.D.

Okla. 2006)(motion to dismiss involuntary petition denied where reasonable employment of state

law means was unsuccessful to satisfy debts which might be recoverable by a Trustee in a

bankruptcy proceeding).

**B.    A REASONABLE PERSON WOULD NOT FIND THE INVOLUNTARY PETITION WAS FILED IN BAD FAITH.**

BB&T's filing of the involuntary petition was reasonable as (1) BB&T qualifies as a

petitioning creditor; (2) insiders control the Debtor and a bankruptcy Trustee is needed to protect

creditors such as BB&T by recouping preferential, voidable, or even fraudulent transfers from

insiders attempting to gain a disproportionate advantage; (3) this is not just a two-party dispute as

evidenced by the fact that R&S did not file the Motion to Dismiss Involuntary Petition alone, but

filed the Motion on behalf of R&S, Rad, Nourafchan, Forouzan, and RPN; (4) the state court

litigation never addressed the merits of the case, and prohibited the FDIC or Colonial from being

substituted in or joined as the real party in interest; and (5) the FDIC has a significant interest in

having its Purchase and Assumption Agreement properly interpreted as it is used throughout the

United States and controls billions of dollars in asset transfers.

**1.    BB&T Qualifies As A Petitioning Creditor And R&S Does Not Contest That It Is Not Paying Its Debts As They Become Due.**

In order to be eligible to file an involuntary petition, an entity must hold a claim

against the debtor "that is not contingent as to liability or the subject of a bona fide dispute as to

liability or amount" and "such noncontingent, undisputed claim(s)" must aggregate at least

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

1    $10,000.00.  11 *U.S.C.* § 303(b)(2).  R&S does not claim that its obligation to BB&T is contingent

2    or disputed as to liability.  To the contrary, R&S acknowledges that the primary debts of R&S are

3    those arising out of the $12,000,000.00 R&S Lenders Loan as well as the $43,980,000.00 Colonial

4    Construction Loan.  Motion, ¶43.  With a fair market value of the Property at $23,555,000.00, the

5    resulting unsecured deficiency amounts to approximately $22,000,000.00.  Motion, ¶44-¶45.  Even

6    if R&S disputes the amount that BB&T is entitled to with regard to the deficiency, BB&T's claim

7    will still be in the millions of dollars.  The statute does not require a petitioner to hold a liquidated

8    claim – only that a noncontingent claim exists in an amount over the statutory threshold.  See In re

9    Focus Media, Inc., 378 F.3d 916, 926 (9th Cir. 2004), *cert. denied* 544 U.S. 968, 25 S. Ct. 1742

10   (2005); see also  In re DeMirco Holdings, Inc., 2006 Bankr. LEXIS 1131.

11          BB&T clearly qualifies as a petitioning creditor and is entitled to bring an involuntary

12   action, even if on its own.  The Bankruptcy Code § 303 clearly contemplates and allows the filing

13   of an involuntary petition by only one creditor.  11 *U.S.C.* § 303(b)(2); In re Concrete Pumping

14   Service, Inc., 943 F.2d 627, 630 (6th Cir. 1991).  To the extent that this Court determines that the

15   FDIC is the real party in interest, the Court should substitute in and/or join the FDIC as a party.

16          **2.    The Exclusive Powers Of The Bankruptcy Court Are Critical To**
             **Protecting BB&T And The FDIC Against Insiders Rad And**
17           **Nourafchan's Attempts To Obtain Any Disproportionate Advantage.**

18          "Creditors are justified in filing an involuntary bankruptcy against a debtor where

19   exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to

20   'insure an orderly ranking of creditors' claims' and 'to protect against other creditors obtaining a

21   disproportionate share of debtor's assets.'"  In re Hentges, 351 B.R. at 770 *quoting* In re Better

22   Care, Ltd., 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989).  In addition, "[c]reditors may also use the

23   bankruptcy process to install a trustee to prevent future transfers or wasting or dissipation of assets

24   or to investigate and to challenge the legitimacy of entities that may be operating as alter egos of a

25   debtor."  In re Hentges, 351 B.R. at 772.  In Hentges, the Debtor was preferring other creditors over

26   the petitioning creditors.  The Debtor was also freely transferring assets and assigning earnings to

27   entities he controlled.  That is precisely the situation here.  Rad and Nourafchan are attempting to

28   prefer an insider, that masquerades as a creditor, R&S Lenders, to the detriment of BB&T because

R&S Lenders is a sham entity which is nothing more than an extension of Rad and Nourafchan themselves.

In filing the involuntary petition, BB&T reasonably believed that the exclusive power of the bankruptcy court to avoid preferential transfers and stop insider transfers is absolutely necessary as it potentially involves millions of dollars funneled through various insider-entities all controlled by Rad and Nourafchan. At the very least, it puts an immediate stop to the further dissipation of estate assets. See In re Everet, 178 B.R. 132 (Bankr. N.D. Ohio 1994); see also 2 Collier on Bankruptcy ¶ 303.8[1]. As set forth above, Rad and Nourafchan obtained more than $19,200,000.00 from individual lenders. While Rad and Nourafchan allege that R&S borrowed money from R&S Lenders to purchase the Property, R&S Lenders was not formed until after the close of escrow. See Deposition of Rad attached to the Shumway Declaration as Exhibit "G," pgs. 28-29. Accordingly, an investigation is needed to determine what happened to all of this money, how much money R&S received, which insiders it was transferred to, and what money may be recovered by he Chapter 7 Trustee as avoidable, fraudulent and preferential transfers and available to its creditors. A Trustee will likely have more success tracking down these assets as the Debtor's records will belong to the Trustee rather than being controlled by the very insiders who wish to prevent such transfers from being disclosed or avoided. See In re Hentges, 351 B.R. at 772.

In addition, a Trustee will be able to prevent future, ongoing dissipation of assets of the Debtor, R&S. A clear example of the Debtor's squandering of its own assets for the benefit of its own insiders is evident from its participation in the state court litigation. As discussed more fully below, the state court litigation pertains to lien priority regarding two deeds of trust encumbering the Property. The outstanding liens on the Property total at least $45,555,000.00. See Motion at ¶45. Regardless of who wins priority, it is uncontested that there will be an unsecured deficiency of roughly $22,000,000.00. Id. As the Debtor will surely lose the Property to foreclosure regardless of who has priority, there is no benefit for R&S to argue that R&S Lenders has priority. The only explanation for R&S's participation and argument in favor of R&S Lenders retaining priority is the fact that both entities are controlled and owned by Rad and Nourafchan. In fact, considering that Rad and Nourafchan signed personal guarantees on the Construction Loan but not on the R&S

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

13

Lenders Loan, it would have made more financial sense for R&S to agree that BB&T held priority rather than R&S Lenders as Rad and Nourafchan would personally be subject to a lesser deficiency after foreclosure. The only reason for R&S to argue against the priority of BB&T, is to benefit Rad and Nourafchan, acting in the legal fiction as R&S Lenders, and to assist Rad and Nourafchan in gaining a disproportionate share of R&S's assets as insiders. With a deficiency judgment for millions of dollars just around the corner, for which Rad and Nourafchan would be personally liable under the terms of the Construction Loan, it is likely that they are already contemplating the protection of bankruptcy. Accordingly, the involuntary petition serves the interests of both creditor and the Debtor in this instance.

A bankruptcy Trustee will also serve to investigate and challenge the legitimacy of entities that are believed to be operating as alter-egos of the Debtor or its principals. See In re Giampietro, 317 B.R. 841 (Bankr. D. Nev. 2004); see also In re Hentges, 351 B.R. at 772. Rad and Nourafchan are the sole principals of both R&S and R&S Lenders. Bankruptcy law permits a Trustee to investigate the alter ego status of such closely related entities. The three requirements for ignoring the separate existence of Rad and Nourafchan's entities incluce: (1) the corporation must be influenced and governed by the person asserted to be its alter ego; (2) there must be such unity of interests and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice. In re Giamietro, 317 B.R. 841, 847 *citing* McCleary Cattle Co., 73 Nev. 279, 282, 317 P.2d 957, 959 (1957).

Here, injustice would be promoted by adherence to the fiction that Rad and Nourafchan as R&S Lenders did not agree to the terms and conditions found in the Construction Loan that they themselves signed on behalf of the Debtor, R&S. When making the Construction Loan, Colonial always operated under the assumption that the R&S Lenders DOT would be released as Colonial required a first position deed of trust on the Property. Its expectation of priority can be found in the provisions of the Construction Loan DOT. Specifically, the Construction Loan DOT requires that Colonial be subrogated to the lien position of any encumbrance that the Construction Loan paid off. Now, Rad and Nourafchan contend that they, as R&S Lenders, never agreed to the subrogation

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

requirement that they signed and agreed to, as R&S, and that granting BB&T subrogation or replacement would be prejudicial to R&S Lenders.  Rad and Nourafchan's argument clearly demonstrates their preference for themselves and their status as insiders and their alter-ego entities, R&S and R&S Lenders.  Accordingly, a Trustee should be allowed to investigate as to whether the legal fiction of the separate existence of R&S and R&S Lenders should be disregarded.

In addition, the majority of individual lenders that provided funds to Rad and Nourafchan are family members, friends, and acquaintances.  As such, Rad and Nourafchan, as both borrower and lender, will have already indicated their preference of themselves, family members, and friends over an institutional lender such as BB&T through R&S's participation in the state court litigation by arguing against BB&T's priority.  Therefore, the exclusive power of the bankruptcy court to subordinate obligations to insiders and to appoint a Trustee to investigate and determine the alter-ego status of Rad and Nourafchan's entities is necessary in this case and supports the denial of R&S's Motion to Dismiss.

Finally, bankruptcy law allows for equitable subordination, an exclusive bankruptcy cause of action, which would operate in favor of BB&T.

### 3. The Present Case Is Not A Two-Party Dispute, It Involves Multiple Parties, Including The FDIC.

The Bankruptcy Code makes it clear that an involuntary petition need only be filed by one creditor.  11 *U.S.C.* § 303(b)(2); In re Concrete Plumbing Service, Inc., 943 F.2d 627, 630 (6th Cir. 1991).  A single creditor can initiate an involuntary petition under 11 U.S.C. § 303(b)(2) and the court shall enter an order for relief.  See In re Ex-L Tube, Inc., 2007 Bankr. LEXIS 402 (Bankr. W.D. Mo.)(bankruptcy court granted involuntary petition by a single creditor when debtor had less than 12 creditors, there was no dispute that debtor was not paying its obligations as they became due, and creditor sought payment to occur according to the bankruptcy code priorities).  However, courts usually scrutinize one-creditor filings closely to make sure that an involuntary petition is not filed unfairly or abusively by a creditor to put an operating company into bankruptcy in order to gain leverage in resolving legitimate disputes.  See In re E.S. Prof'l Servs., 335 B.R. 221 (Bankr. S.D. Fla. 2005); Fed. Fin. Co. v. Dekaron Corp., 261 B.R. 61 (S.D. Fla. 2001); In re

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

GERRARD, COX & LARSEN
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

DeMirco Holdings, Inc., 2006 Bankr. LEXIS 1131.

In this case, BB&T filed the involuntary petition against the Debtor, R&S. However, this is not just a two-party dispute between BB&T and R&S. Although it is believed R&S Lenders is merely the alter-ego of Rad and Nourafchan, R&S Lenders is also a known creditor of R&S listed on the involuntary petition. See Involuntary Petition attached to the Shumway Declaration as Exhibit "N." In addition to R&S Lenders, the FDIC may also be a creditor pursuant to the terms and conditions and loss share provisions of the Purchase and Assumption Agreement between the FDIC and BB&T. Finally, Community Bank of Nevada[5] held a 1/3 participation interest in the Construction Loan. A true and correct copy of the Participation Agreement attached to the Shumway Declaration as Exhibit "O" and incorporated herein by this reference. Therefore, at a minimum, this dispute includes BB&T, R&S, R&S Lenders, FDIC, and possibly First Southern National Bank as successor in interest to Community Bank of Nevada's participation interest.

Further evidence that this is more than just a two-party dispute is the fact that the Motion to Dismiss Involuntary Petition was not filed by the Debtor alone; rather, the Motion was filed on behalf of R&S, Rad, Nourafchan, Forouzan, and RPN. Rad and Nourafchan obviously believe they are part of this litigation and do not want a Trustee looking over their books, investigating alter ego status, or preventing further waste of R&S's resources, because it does not directly benefit Rad and Nourafchan.

With regard to the involuntary petition, the petition does not unfairly or abusively operate to give BB&T or the FDIC any leverage or advantage in resolving priority disputes. See In re DeMirco Holdings, Inc., 2006 Bankr. LEXIS 1131; In re E.S. Prof'l Servs., 335 B.R. 221 (Bankr. S.D. Fla. 2005). R&S was formed for the sole purpose of holding the Property in order to flip it a year later to Centex Homes. See Declaration of Rad, ¶12-14 attached to the Shumway Declaration as Exhibit "J." With the Property over-leveraged by approximately $22,000,000.00, R&S has no legitimate business to conduct and this Court should proceed with liquidation of the Debtor's estate.

_____

[5]The FDIC was appointed as receiver for Community Bank of Nevada and sold its participation interest in the Construction Loan to First Southern National Bank. A true and correct copy of the Loan Sale Agreement is attached to the Shumway Declaration as Exhibit "P."

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

1  Bankruptcy does not prejudice R&S or interfere with its business operations as the Property was its

2  only business.

3      **4.**    **The State Court Litigation Never Addressed Priority On Its Merits And**
              **The FDIC Was Never Permitted To Be Substituted In As The Real Party**

4                **In Interest.**

5          With regard to the state court litigation, the Debtor would have this Court believe

6  that BB&T is attempting to attack or circumvent the trial court ruling regarding the Purchase and

7  Assumption Agreement.  Generally, the trial court held that it could not determine whether the

8  Purchase and Assumption Agreement assigned the loan at issue from the FDIC to BB&T.  <u>See</u> Trial

9  Transcript, Day 9, Pg. 25.  In so doing, the trial court never reached the merits of the case as to lien

10  priority.  At the very minimum, the FDIC should have been substituted in as the real party in

11  interest or joined thereto in order to reach the issue of priority.

12          As of May 13, 2010, the date on which the involuntary petition was filed, no final judgment

13  had been entered in the trial court.  In any event, the state court litigation does not preclude BB&T

14  from filing an involuntary petition as the state court litigation never dealt with the issue of

15  preventing insider transfers and preferential or fraudulent transfers by the Debtor.  In addition, the

16  state court litigation did not address the more than $19,200,000.00 that Rad and Nourafchan

17  funneled into their companies that needs to be accounted for as potential property of the estate.  The

18  state court litigation also did not halt further waste and dissipation of assets by R&S in the form of

19  attorneys fees and costs expended to continue litigating priority when it does not benefit R&S in

20  any way to argue that R&S Lenders or BB&T should have priority.  As explained above, because

21  Rad and Nourafchan signed personal guarantees on the Construction Loan but not on the R&S

22  Lenders Loan, they would be subject to a lesser deficiency judgment if they argued that the

23  Construction Loan held priority.

24          Rad and Nourafchan's  contention that this matter is similar to <u>In re VII Holdings Co.</u>, 362

25  B.R. 663 (Bankr. D. Del. 2007) is misplaced.  In <u>VII Holdings Co.</u>, the court dismissed a second

26  involuntary petition when the automatic stay terminated five years after the first involuntary

27  petition was filed and there was no purpose for the petition other than to frustrate repeated

28  foreclosure attempts.  <u>Id.</u> at 666.  Here, while the involuntary petition does act to stay foreclosure of

1    the Property, BB&T has several reasons, as stated here, for filing the petition and desires nothing

2    more than to insure payment to itself and any other creditors according to bankruptcy's priority

3    scheme. See In re Ex-L Tube, Inc., 2007 Bankr. LEXIS 402 (Bankr. W.D. Mo.).  For the reasons set

4    forth herein, the involuntary petition by BB&T was filed in good faith and the Debtor has not

5    overcome the presumption.

6          **5.      As The Disposition Regarding Lien Priority Directly Impacts The FDIC,
              The FDIC Has An Interest And Must Be Allowed To Participate In The
7              Interpretation Of Its Own Purchase And Assumption Agreement.**

8          If the Purchase and Assumption Agreement is "internally inconsistent" and "incomplete,"

9    then the FDIC has a vested interest in determining what part is "internally inconsistent" and

10   "incomplete" as this standard agreement is used throughout the country to transfer billions of

11   dollars of assets of failed banks.  Either way, the FDIC is still a party with significant interests

12   under the loss-share provisions of the Purchase and Assumption Agreement.  BB&T as well as the

13   FDIC has the right to participate in this case and assert its equitable subrogation / replacement

14   rights concerning priority.

15         As the state court judge did not permit the FDIC or Colonial to assert its rights as a creditor

16   of the Debtor, this involuntary bankruptcy is necessary to avoid other creditors, such as R&S

17   Lenders, from gaining an disproportionate advantage over the FDIC.

18   **C.     NEITHER THE INTERESTS OF THE CREDITORS NOR THE DEBTOR WILL BE
            SERVED BY DISMISSAL OF THE INVOLUNTARY PETITION UNDER 11 U.S.C.
19          § 305(a).**

20         Dismissal under 11 U.S.C. § 305(a) is an "extraordinary remedy" and is meant to be the

21   exception rather than the rule "to prevent the commencement and continuation of disruptive

22   involuntary cases."  2 Collier on Bankruptcy, ¶ 305.01[1]; see also In re Edwards, 214 B.R. 613,

23   620 (B.A.P. 9th Cir. 1997) citing Eastman, 188 B.R. at 624.  Before a court may abstain from

24   exercising jurisdiction over an otherwise proper case, the court must make specific and

25   substantiated findings that the interests of the creditors and the debtor will be better served by

26   dismissal.  See In re Spade, 258 B.R. at 255; see also In re Jr. Food Mart of Arkansas, Inc., 241

27   B.R. 423, 426 (Bankr. E.D. Ark. 1999).

28         R&S argues that the involuntary petition was not motivated by fairness for all creditors but

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

in furtherance of a two party dispute.  While this Court will likely address lien priority since it is

considered a core proceeding under 28 *U.S.C.* § 157(b)(2)(K), the involuntary petition was filed to

prevent insiders from obtaining a larger portion of the estate of the Debtor as well as determine

what funds the estate of the Debtor includes.  Specifically, Rad and Nourafchan are the principals

of both R&S and R&S Lenders, and these sham entities appear to be nothing more than extensions

of Rad and Nourafchan.  R&S's participation in the state court litigation disputing priority without

any real benefit to R&S evidences Rad and Nourafchan's insider-mentality and efforts to prefer

themselves and their alter-ego entities over legitimate creditors.  Rad and Nourafchan have

funneled more than $19,200,000.00 through their entities to themselves under the guise of the

Debtor.  A bankruptcy trustee is best equipped to investigate and determine whether the entities

controlled by Rad and Nourafchan are their alter-egos as well as what monies make up the Debtor's

estate.

Importantly, fairness to all creditors must include allowing the FDIC to assert its legitimate

interest in the Property.  If the Purchase and Assumption Agreement did not result in a transfer of

the Construction Loan to BB&T (as intended by the parties thereto), then the FDIC owns this loan

and the security, and therefore has an absolute right to have its claims adjudicated and to stop

further preference by the Debtor of its alter-ego, insider affiliates.  As set forth above, this case

involves multiple parties.  And as Rad, Nourafchan, Forouzan, RPN, and R&S all filed the Motion

to Dismiss Involuntary Petition, it appears safe to say that this is clearly not just a two party dispute.

R&S also argues that economy and efficiency of administration support dismissal.  The only

way for economy and efficiency to be served in this case is if R&S is prohibited from squandering

away any more of its assets by disputing priority or participating in further state court litigation

when it clearly has not paid its debts on time to BB&T.

Finally, the interests of the creditors and the Debtor will not best be served by dismissal.

The legislative history of 11 U.S.C. § 305 indicates that the focus of Congress behind this section

was to prevent a few dissident creditors from stopping an out-of-court agreement acceptable to

most others.  See Collier on Bankruptcy ¶ 305-3[1]; see also In re Eastman, 188 B.R. 621, 624-625

(B.A.P. 9th Cir. 1995).  Without the bankruptcy court's exclusive powers, no Trustee will be

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000

appointed to examine the insider transfers and the millions of dollars that have been funneled through Rad and Nourafchan's entities for which no accounting has been made. The alter-ego status of Rad and Nourafchan and their entities will also remain unknown and prevent legitimate creditors of Rad and Nourafchan and their affiliated entities from recovering assets that a Trustee would likely be able to uncover. Without bankruptcy court's exclusive powers, the more than $19,200,000.00 raised by Rad and Nourafchan will largely go unaccounted for when that money is obviously property of the bankruptcy estate.

## IV.

## CONCLUSION

In conclusion, multiple reasons exist as to why the involuntary petition of bankruptcy filed by BB&T should not be dismissed. The presumption is that the involuntary petition was filed in good faith and it falls on the Debtor to overcome the presumption by a preponderance of the evidence. The Debtor and its affiliates are unable to do so. Because BB&T is a qualified petitioner under the Bankruptcy Code and seeks to use exclusive bankruptcy powers to protect its interests from insiders and prevent future waste of the estate of the Debtor, the involuntary petition should not be dismissed. This is not the kind of two party dispute that courts will scrutinize where a creditor files a petition to gain an advantage over the debtor; rather, this is a multi-party dispute that has not progressed to a decision on the merits and best brought before the Bankruptcy Court.

Therefore, R&S's Motion must be denied. This Court should appoint a Trustee to account for the millions of dollars that have been funneled through Rad and Nourafchan's entities. The Debtor, R&S, is not adversely affected as a result of the involuntary petition as its sole purpose concerns the Property at issue herein.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

20

1    Dated this __9th__ day of June, 2010.

2                                          **GERRARD COX & LARSEN**

3

4                                          __/s/ Douglas D. Gerrard_____
                                           Douglas D. Gerrard, Esq.
5                                          Nevada Bar No. 4613
                                           Sheldon A. Herbert, Esq.
6                                          Nevada Bar No. 5988
                                           Aaron B. Shumway, Esq.
7                                          Nevada Bar No. 10759
                                           2450 Saint Rose Pkwy., Suite 200
8                                          Henderson, NV  89074
                                           *Attorneys for Branch Banking and Trust*
9                                          *Company, successor by assignment to Federal*
                                           *Deposit Insurance Corporation, as receiver of*
                                           *Colonial Bank N.A.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GERRARD, COX & LARSEN**
2450 St. Rose Parkway, Suite 200
Henderson, Nevada 89074
(702) 796-4000