1 | Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
2 | Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
Email: oatamoh@nevadafirm.com
3 | SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON
4 | 400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
5 | Telephone:    702/791-0308
Facsimile:    702/791-1912

E-filed on: June 16, 2010

*Attorneys for Forouzan, Inc. and RPN, LLC, Saiid Forouzan Rad, and Phillip Nourafchan*

Julie Sanpei, Esq. (NV Bar No. 5479)
Email: jsanpei@bckltd.com
BAILUS COOK & KELESIS, LTD.
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/385-3788
Facsimile:    702/737-7712

*Attorneys for R&S St. Rose, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

R&S ST. ROSE, LLC,

Alleged Debtor.

Case No. BK-S-10-18827-MKN
Involuntary Chapter 7

**REPLY IN SUPPORT OF MOTION TO DISMISS INVOLUNTARY PETITION**

Date of Hearing:    June 23, 2010
Time of Hearing:    9:30 a.m.
Place: Courtroom No. 2, Third Floor
       Foley Federal Building
       300 Las Vegas Blvd., S.
       Las Vegas, NV 89101

Judge: Hon. Mike K. Nakagawa

R&S ST. ROSE, LLC ("R&S St. Rose"), by and through its counsel Julie L. Sanpei, Esq. with the law offices of BAILUS COOK & KELESIS, LTD., and FOROUZAN, INC. and RPN, LLC, SAIID FOROUZAN RAD, and PHILLIP NOURAFCHAN (collectively, the "Movants"), by and through their counsel Richard F. Holley, Esq., with the law offices of SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON, hereby file this Reply in Support

07906-01.001/609142.doc

of the Motion to Dismiss Involuntary Petition (the "Reply"). This Reply is based upon the following grounds and for the following reasons: (i) it is clear from the Opposition filed by Branch Banking & Trust ("BB&T"), that the involuntary petition was filed in bad faith and in an attempt to relitigate the priority of the $43 Million DOT already determined by the trial court after ten (10) days of trial spanning a period of four (4) months; (ii) BB&T does not satisfy the requirements for commencing an involuntary petition against R&S St. Rose as underscored by the trial court's finding that BB&T failed to demonstrate that the $43 Million DOT was acquired by and assigned to BB&T; (iii) allegations of "sham" corporate entities, alter ego and avoidable transfers are nothing more than pretexts and feeble attempts to mask the improper use of an involuntary petition to collaterally attack the trial court priority ruling; and (iv) the involuntary petition serves no legitimate purpose and is therefore not in the best interest of creditors.

Dated this 16th day of June, 2010.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

*/s/ Richard F. Holley*

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912
*Attorneys for Forouzan, Inc. and RPN, LLL,*
*Saiid Forouzan Rad, and Phillip Nourafchan*

**BAILUS COOK & KELESIS, LTD.**

　　/s/ Julie Sanpei
Julie Sanpei, Esq. (NV Bar No. 5479)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/385-3788
Facsimile: 702/737-7712
*Attorneys for R&S St. Rose, LLC*

- 2 -

07906-01.001/609142.doc

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In the Motion to Dismiss, the Movants contended that the involuntary petition was commenced in bad faith in order to collaterally attack the trial court ruling that the $43 Million DOT was junior in priority to the $12 Million DOT. The Opposition filed by BB&T confirms and supports this premise. BB&T was obviously upset with the trial court's priority ruling and clearly rocked by the trial court's denial of BB&T's motion for stay pending appeal. In the wake of these adverse rulings, BB&T chartered a course designed to circumvent the appellate process, obtain the desperately sought after stay denied by the trial court in order to stave off the pending foreclosure by St. Rose Lenders of the $12 Million DOT and collaterally attacked the trial court ruling regarding priority and the evidentiary shortfalls of BB&T in establishing its status as an assignee of the $43 Million DOT.

The scheme is simple: commence an involuntary bankruptcy petition. The filing of the involuntary petition provided the immediate injunctive relief denied by the trial court to delay foreclosure by St. Rose Lenders, regardless of whether the involuntary petition is meritorious. Next, BB&T is attempting to utilize the bona fide petitioning creditor requirement to collaterally attack and relitigate the assignment issue adversely decided by the trial court after 10 days of trial spanning a four month period. Next, BB&T extends the collateral attack of the trial court's priority decision by arguing that the priority issue is a core proceeding that must be decided by the bankruptcy court. In this regard, BB&T contends that not only must the bankruptcy court again adjudicate BB&T's previously presented and rejected theories of contractual subrogation, equitable subrogation and replacement, but BB&T also attacks the validity of the $12 Million DOT on the grounds of alter ego, "sham" companies and transactions and fraud as a means of invoking equitable subordination to achieve priority.[1]

---

[1] The failure of BB&T to attack the validity of the $12 Million DOT in the state court proceeding as a means of establishing priority is another deficiency in BB&T's state court action that it hopes to remedy in the bankruptcy court.

07906-01.001/609142.doc

- 3 -

Realizing that it will face a challenge to the involuntary petition on bad faith grounds, BB&T presents a façade of need for the bankruptcy petition by alleging, without any admissible evidentiary support, "sham" corporate entities, alter ego, fraud and avoidable transfers. Mind you, these allegations are made notwithstanding the fact that Colonial Bank had extended scores of loans for tens-of-millions of dollars to Forouzan and Nourafchan owned entities with similar ownership structure for a period spanning more than a decade; the loan documents for the $29 Million DOT clearly identify the ownership structure of R&S St. Rose; knowledge by Colonial Bank that the property purchase to be funded by the $29 Million DOT required additional third party financing; modification of the $29 Million DOT required the subordination of the $12 Million DOT and clearly identified the ownership structure of St. Rose Lenders; the Construction Loan and Construction Loan Documents clearly identified the ownership structure of R&S St. Rose Lenders and knowledge of the $12 Million DOT; the alleged "sham entities" all banked with Colonial Bank; Colonial Bank had banking records for each of the alleged "sham" entities including R&S St. Rose, St. Rose Lenders and R&S Investment Group s as evidenced by the Rule 16.1 document production by BB&T in the state court case; R&S St. Rose produced financial documents in its 16.1 document production that clearly identified the source, use and purpose of funds obtained by R&S St. Rose, including interest to those providing funds to St. Rose Lenders and operating expenses of R&S St. Rose; and possession by BB&T of copies of promissory notes produced as part of the Rule 16.1 document production and submitted as trial exhibits in the state court trial detailing post property purchase loans extended by R&S Investment totaling millions of dollars to cover these expenses and interest payments.

In summary, the allegations of fraud, alter ego, "sham" companies and avoidable transfers are nothing more than a pretext and feeble attempt to legitimize the improperly filed involuntary petition. The true intent and purpose of the involuntary petition is acknowledged by BB&T in its Opposition. Buried in the Opposition at p. 18, is the following statement:

> BB&T as well as the FDIC has the right to participate in this case and assert its equitable subrogation/replacement rights concerning priority.

. . .

- 4 -

07906-01.001/609142.doc

> As the state court judge did not permit the FDIC or Colonial Bank to assert its rights as a creditor of the Debtor, this involuntary bankruptcy petition is necessary to avoid other creditors, such as R&S Lenders, from gaining an [sic] disproportionate advantage over the FDIC.

Disappointment over a trial court ruling of an underlying dispute after a prolonged trial on the merits and subsequent denial of injunctive relief to stay a pending foreclosure are not legitimate grounds to commence an involuntary petition to relitigate issues that were or should have been raised at trial, or to pursue a defacto appeal by forum shopping. The proper course is for BB&T to pursue an appeal to the Nevada Supreme Court and other post judgment remedies. The involuntary petition was filed in bad faith and BB&T does not satisfy the requirements to commence an involuntary petition. In the alternative, the bankruptcy court should abstain and dismiss the involuntary petition for the reasons stated in the Motion.

## II.  LEGAL ARGUMENT

### A.  BB&T Filed the Involuntary Petition in Bad Faith

Not surprisingly, BB&T denies that the involuntary petition was filed in bad faith. BB&T contends that an objective person would find that the involuntary petition was in fact properly filed. In this regard BB&T argues as follows: (1) it is a qualified petitioning creditor (not withstanding the trial court's determination to the contrary based upon a 10-day trial), or in the alternative, the FDIC should be substituted in as the proper party (notwithstanding the trial court's refusal to do so after briefing and oral argument); (ii) insiders control R&S St. Rose and that a trustee is allegedly needed to protect estate assets, investigate transactions and prevent alleged pillaging by insiders so that insiders do not gain a disproportionate advantage (meaning, the trial court ruling on priority must be reversed such that St. Rose Lenders does not foreclose on the $12 Million DOT); (iii) the filing of the involuntary petition is not in furtherance of a two-party dispute (because there are more than two parties litigating); (iv) the state court allegedly did not address the priority issue on the merits and consequently the bankruptcy court should now do so; and (v) the FDIC has an interest in having its Purchase and Sale Agreement being "properly interpreted" (as opposed to being improperly interpreted by the trial court).

. . .

- 5 -

07906-01.001/609142.doc

As a preliminary matter, an inquiry is appropriate to determine the legitimate purpose of the parties who have sought to invoke the jurisdiction of bankruptcy and it is within the Court's discretion to take appropriate steps to prevent the abuse of the bankruptcy process pursuant to 11 U.S.C. § 105(a). See In re Manhattan Industries, Inc., 224 B.R. 195, 201 (Bankr. M.D.Fla. 1997) (holding that there was no legitimate purpose for the involuntary petition, where motivation in filing for involuntary relief was inconsistent with the policy behind involuntary bankruptcies, therefore lacking in good faith due to its improper purpose in filing its involuntary petition even if it had standing to file under § 303(b)(2)). The Manhattan Industries, Inc. court granted the Debtor's Motion to Dismiss the involuntary petition because the judgment claim obtained by the petitioning creditor was subject to a "bona fide dispute" and the involuntary petition was filed with the intent to frustrate the Debtor's New Jersey proceedings, thereby lacking good faith. Id.

The Manhattan Industries, Inc. court looked to the following reasons that make involuntary bankruptcy justifiable, which it found were absent in the case before it:

1. The Debtor was not giving preferred treatment to certain creditors or making fraudulent transfers. See e.g. In re Better Care, Ltd., 97 B.R. 405, 410 (Bankr.N.D.Ill.1989).

2. The Debtor has not dissipated its assets allowing the creditor to seek to replace the Debtor's management with a Trustee. Rather, MBC has attempted to exercise bankruptcy laws to adversely affect the state court litigation against the Debtor. One of the reasons given for this petition was an expressed intent to defeat the Debtor's right to be heard in state court. The state court litigation was filed by the Debtor after it unsuccessfully tried to negotiate a resolution with MBC regarding its dealings pursuant to its franchise agreement. Faced with a potential monetary judgment against it, MBC has tactically decided to take on the offensive by filing an involuntary against the Debtor.

3. Use of the bankruptcy process as a means to promote individual interest, which is inconsistent with the Bankruptcy Code as it will allow a petitioning creditor to use bankruptcy laws as a sword rather than as a shield. See Shell Oil Co. v. Waldron (In re Waldron), 785 F.2d 936, 940 (11th Cir.1986).

. . .

07906-01.001/609142.doc

In *In re Tichy Elec. Co. Inc.*, 332 B.R. 364, 372 (Bankr.N.D.Iowa 2005), the bankruptcy court held that the goal or purpose of an involuntary filing should be the equal distribution of assets among creditors. Id. (citing *In re Smith*, 243 B.R. 169, 174 (Bankr.N.D.Ga.1999)). "The filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." Id. (citing *In re Reid*, 773 F.2d 945, 946 (7th Cir.1985)). In *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1502 (11th Cir.1997), the Eleventh Circuit held that protecting against other creditors' obtaining a disproportionate share of a debtor's assets "is a proper purpose for filing an involuntary petition." See *In re Tichy Elec. Co. Inc.*, 332 B.R. 364, 372 (quoting *In re Smith*, 243 B.R. 169, 199 (Bankr.N.D.Ga. 1999)). The objective basis for the creditor's perception of disproportionate dismemberment of the debtor is linked to the pattern of the debtor not paying its debts as they became due. Id. (citing *In re Better Care, Ltd.*, 97 B.R. 405, 411 (Bankr. N.D.Ill. 1989)).

In *In re Silverman*, 230 B.R. 46, 53 (Bankr. D.N.J. 1998), the court looked to the decision in *In re Better Care, Ltd.*, 97 B.R. at 411, regarding the proper purpose for an involuntary petition, stating as follows:

> The proper purpose of a creditor filing an involuntary petition is to protect against other creditors obtaining a disproportionate share of the debtor's assets. The objective basis for the creditor's perception of disproportionate dismemberment of the debtor is linked to the pattern of the debtor not paying its debts as they become due. An improper use of the Bankruptcy Code justifying a finding of bad faith will then exist any time a creditor uses an involuntary bankruptcy to obtain a disproportionate advantage to that particular creditor's position, rather than to protect against other creditors obtaining such a disproportionate advantage. This is especially true where the petitioning creditor could have obtained that advantage in an alternate forum.[2]

With these thoughts in mind, and as set forth in detail below, the involuntary petition was clearly filed improperly and in bad faith to enjoin foreclosure of the $12 Million DOT, to forum

---

[2] It is important to remember that BB&T voluntarily withdrew its fraud claims in the state court proceeding. BB&T could also have pursued alter ego claims like Murdock and Keach as well as other forms of injunctive relief in the in state court, but failed to do so. Finally, BB&T could have alleged fraudulent conveyance under NRS 112, but elected not to do so.

07906-01.001/609142.doc

shop and collaterally attack the trial court ruling on priority. Inflammatory statements notwithstanding, a reasonable person simply cannot draw any other inference or conclusion based upon the facts.

### 1. BB&T is Not an Eligible Petitioning Creditor.

First, BB&T contends that it qualifies as a petitioning creditor. This is simply not true. BB&T is not eligible to file the involuntary petition because it is not a "holder of a claim" within the meaning of 11 U.S.C. §303(b) because the claim is subject to bona fide dispute.

At the beginning of the 10-day trial, Judge Gonzales specifically and expressly identified the issues to be tried:

> I have two issues I have to determine as part of this hearing – or at least two issues I have to determine. One is whether there was in fact a replacement theory that should be applied to Colonial Bank as a result of the second loan that occurred in this. And then the second issue I have to determine is the nature of the relationship between the Colonial Bank loan and the BB&T entity's. In making that determination I'm going to listen to the evidence before I apply the theories that you're saying, because I have to make a determination as to whether there's an assignment that exists, if it's a successor in interest that exists, or if it's some other nature of an acquisition.
>
> Okay. Which is why I am listening to evidence.

See Supplemental Holley Declaration, **Exhibit "13"**, p.42, ll. 23-25, p.43, ll. 1-10 (Evidentiary Hearing—Day 1).

After 9 days of trial and after BB&T presented its case and rested, Judge Gonzales ruled that the Purchase and Assumption Agreement is internally inconsistent, incomplete, ambiguous, conflicting and missing referenced schedules. As such the trial court was prevented from making a finding that an assignment of the $43 Million Loan had occurred between the FDIC and BB&T. See Holley Declaration, Ex. 6, pp.27-29 (Evidentiary Hearing—Day 10)[3];

. . .

. . .

. . .

---

[3] "[M]y determination is from an evidentiary perspective Exhibit 183 is insufficient because of the problems that I as the fact finder observe with Exhibit 183 to effect a transfer."

- 8 -

07906-01.001/609142.doc

Supplemental Holley Supplemental Declaration, **Exhibit "14"**, pp. 24-25 (Evidentiary Hearing—Day 9).[4] As a result of the trial court's ruling, BB&T's alleged "claim" is subject to bona fide dispute and therefore BB&T does not qualify as a petitioning creditor.[5]

 2. **Bankruptcy is Not Necessary to Protect Estate Assets, Investigate Transactions or Prevent Alleged Pillaging by Insiders so That Insiders do not Gain a Disproportionate Advantage.**

BB&T next argues that bankruptcy is necessary to allegedly protect estate assets, investigate transactions and prevent alleged pillaging by insiders so that insiders do not gain a disproportionate advantage.[6] Specifically, BB&T contends that St. Rose Lenders was not formed until after closing of the $29 Million DOT; St. Rose Lenders, R&S St. Rose and R&S Investment Group are sham companies and nothing more than alter egos of Mr. Forouzan and Mr. Nourafchan; and that Mr. Forouzan and Mr. Nourafchan have failed to account for and by implication, have wrongfully taken $19.2 of R&S St. Rose assets. None of these statements are supported by admissible evidence and are simply false and mere fabrications created to feign the need for a trustee's investigation.

**Timing and Formation of St. Rose Lenders**

For example, BB&T builds its "sham" argument regarding R&S St. Rose Lenders as a "sham entity" and "legal fiction" on the factual misrepresentation that R&S Lenders was not formed until after the August 26, 2005 closing of the property purchase:

> As R&S Lenders was not formed until after the purchase of the Property, Rad and Nourafchan funneled the monies from these individual lenders through one of the R&S Investment Group entities.

See Opposition, p. 5, ll. 10-13 [Dkt. No. 17].

---

[4] "Exhibit 183 [the Purchase and Assumption Agreement] is internally inconsistent and is incomplete. It prevents the court from making a finding that an assignment has occurred of the loan that is at issue."

[5] As an aside, it should be noted that BB&T's characterization of the trial court's ruling on the assignment by referring to the ruling on the assignment as a "standing" issue is false. To the contrary, the trial court expressly and unequivocally stated on the record that the issue before court is not a standing issue, but an evidentiary failure. See Holley Declaration, Ex. 6, p. 26, l. 19 (stating on the record that "It's not a standing issue, Mr. Gerrard").

[6] The phrase "disproportionate advantage" may be translated to mean the bankruptcy court must reverse the priority decision of the trial court so that St. Rose Lenders does not foreclose on the $12 Million DOT to the detriment of the $43 Million DOT.

- 9 -

07906-01.001/609142.doc

A simple search of the Nevada Secretary of State's records reveals that St. Rose Lenders was formed on August 2, 2005, and filed its Articles of Organization with the Nevada Secretary of State on the same date. A true and correct copy of the Secretary of State results are attached to the Supplemental Holley Declaration as **Exhibit "15"**. The Buyer/Borrower Statement (Final) demonstrates that closing of the transaction occurred on or about August 25, 2005. A true and correct copy of the Buyer/Borrower Statement (Final) which was produced by R&S St. Rose as part of its Rule 16.1 document disclosure and as proposed trial exhibit closing statement is attached to the Supplemental Holley Declaration as **Exhibit "16"**.

**Alter Ego**

Regarding allegations of alter ego, BB&T's conclusory statements have no more support than its argument regarding the timing and formation of St. Rose Lenders. First, as this Court is aware, mere common ownership is not enough to establish alter ego.[7] BB&T has done nothing more than allege common ownership in support of its unsubstantiated alter ego allegations.

Second, the allegations of alter ego are belied by the historical relationship between the parties as well as the documents signed as part of the Property purchase and Construction Loan in this case. Mr. Rad, Mr. Nourafchan, their corporations and Colonial Bank have been involved in eleven (11) prior loans involving millions of dollars during the last decade. Each of these transactions involved similar ownership structures as the subject loans: common ownership and management of special purpose entities formed to borrow funds and develop projects. During the state court trial, Mr. Gerrard, counsel for BB&T introduced proposed trial exhibit number 57 which consists of a single page itemizing the eleven separate loans for tens-of-millions of dollars. The proposed trial exhibit was prepared by or at the direction of Mr. Gerrard and is captioned "Other Colonial loans related to R&S St. Rose, LLC." A true and correct copy of proposed trial exhibit 57 is attached to the Supplemental Holley Declaration as **Exhibit "17"**. Mr. Gerrard's examination of Mr. Rad concerning the "related" loans is attached as to the

---

[7] Truck Insurance Exchange v. Swanson, 124 Nev. 59, 189 P.3d 656, 660-61 (2008) (Nevada Supreme held that the mere fact that Swanson owned a 100-percent interest in the Nevada firm and a 50-percent interest in the California firm, while relevant, is insufficient to show alter ego, i.e., that the Nevada firm was influenced and governed by the California firm).

- 10 -

07906-01.001/609142.doc

Supplemental Holley Declaration as **Exhibit "18"**. Obviously alter ego was not an issue with respect to any of the other 11 loans extended by Colonial Bank to Rad and Noroufchan owned entities.

The loan documents regarding the $29 Million DOT and the $43 Million DOT also demonstrate the common ownership of the borrower. The loan documents pertaining to the $29 Million DOT are all signed on behalf of R&S St. Rose by Mr. Rad as president of Forouzan, Inc. and Mr. Nourafchan as manager of RPN, LLC. Forouzan, Inc. and RPN, LLC are the members and managers of R&S St. Rose. See Rad Declaration, Exhibit 1 (Loan Agreement), 2 (Promissory Note), 3 (Deed of Trust) and 8 (Amendment to Promissory Note). The loan documents pertaining to the $43 Million DOT are also all signed on behalf of R&S St. Rose by Mr. Rad as president of Forouzan, Inc. and Mr. Nourafchan as manager of RPN, LLC. Forouzan, Inc. and RPN, LLC are the members and managers of R&S St. Rose. See Rad Declaration, Exhibit 10 (Construction Loan Agreement), 11 (Promissory Note) and 12 (Deed of Trust).

Moreover, in conjunction with the modification to the promissory note, St. Rose Lenders was required to sign two documents: a Modification to Deed of Trust and Security Agreement and a Subordination Agreement. The Modification to Deed of Trust and Security Agreement is signed on behalf of St. Rose Lenders by Mr. Rad as president of Forouzan, Inc. and Mr. Nourafchan as manager of RPN, LLC. Forouzan, Inc. and RPN, LLC are the members and managers of St. Rose Lenders. See Rad Declaration, Exhibit 7. The Subordination Agreement was signed by Mr. Rad in his capacity as president of Forouzan, Inc., and as manager of St. Rose Lenders. See Rad Declaration, Exhibit "9". Again, Colonial Bank had no issue with alter ego with respect to these transactions.

**Trustee Investigation**

BB&T next contends that the involuntary petition is proper because a trustee must be appointed to investigate alleged dissipation of assets. This dissipation of assets allegedly occurred historically and is purportedly ongoing. None of these allegations are supported by

. . .

- 11 -

07906-01.001/609142.doc

admissible evidence, but are mere unsupported and unsupportable allegations. There is a reason why such allegations lack detail. There are no facts to support BB&T's allegations.

Regarding alleged ongoing dissipation of assets, R&S St. Rose has a single asset consisting of real property. R&S St. Rose is a single purpose entity created for the purpose of purchasing the subject property. The history of the real property transaction from its inception through the failed efforts to develop the property after Centex did not exercise its purchase option, is detailed in Mr. Rad's declaration. There are no assets to dissipate. The real property is going nowhere. BB&T's real concern is that St. Rose Lenders will foreclose on the property since the trial court refused to grant BB&T's request for a stay pending appeal.

Regarding alleged historical dissipation of assets, there is likewise no evidence to support such allegations. First, R&S St Rose, St. Rose Lenders and St. Rose Investment Group all banked at Colonial Bank. BB&T is believed to have all of the bank records including bank statements and cancelled checks. Indeed, Colonial Bank produced over 600 pages of the bank account records including bank statements and cancelled checks as part of its Rule 16.1 document disclosures. A true and correct copy of Colonial Bank's First Supplemental N.R.C.P. 16.1 Disclosure and Document Production dated September 18, 2009 is attached to the Supplemental Holley Declaration as **Exhibit "19"**.

Second, the real issue is not money allegedly taken out of R&S St Rose, but rather money put into R&S St. Rose to facilitate the real property purchase and post closing expenses. BB&T knows that the real property at issue is not and never has been income producing. BB&T also knows that R&S St. Rose was created as a special purpose entity and for the sole purpose of purchasing the property. Any money used by R&S St. Rose to purchase, protect and preserve the property had to come from third parties. The closing statements for the $29 Million Loan identify all non-Colonial Bank money used to purchase the property back in 2005. BB&T has possession of these closing statements in its own files and the closing statements were likewise produced in August 2009 as part of the initial disclosures of the R&S defendants. A true and correct copy of the initial Rule 16.1 disclosures and document production dated August 4, 2009 is attached to the Supplemental Holley Declaration as **Exhibit "20"**.

- 12 -

07906-01.001/609142.doc

Information regarding funds loaned to R&S St. Rose and the source of such funds, as well as supporting documents, were also produced as part of the initial Rule 16.1 disclosures and document production. These documents included without limitation, copies of promissory notes from third parties to St. Rose Lenders, balance sheets and an Account Quick Report. The Account Quick Report in particular documents all of the funds loaned by R&S Investment Group to St. Rose Lenders and the purposes for each such loan. As of September 9, 2008, the run date of the report, R&S Investment Group had loaned in excess of $4 million to cover interest payments to individual lenders as well as other expenses associated with the property such as property taxes, insurance, etc. Each of these advances is evidenced by a promissory note, each of which were identified and produced to Colonial Bank/BB&T as part of the R&S Parties' initial disclosures on August 4, 2009. These funds are all part of the $19.2 million that BB&T contends has been allegedly dissipated. The promissory notes are too voluminous to attach, but attached to the Supplemental Holley Declaration are true and correct copies of the balance sheets and Account Quick Report as **Exhibit "21"**.

It is literally unbelievable that five (5) years after the property was purchased by R&S St. Rose, three (3) years after the Construction Loan was extended to R&S St. Rose, ten (10) months after the production of these documents, the taking of numerous depositions, including the depositions of Mr. Rad and Mr. Noroufchan, and after ten (10) days of trial over a four-month period, that BB&T now suddenly contends that it fears assets were allegedly dissipated and that bankruptcy is the proper forum to investigate the matter. The only salient fact is that this feigned concern and purported need for investigation did not exist until the trial court ruled against BB&T on the priority issue and refused to impose a stay pending appeal. If there was a legitimate concern, BB&T could have sought the appointment of a receiver in the state court action, which it did not do.

3.  **Collaterally Attacking the Trial Court Ruling is not Justification for Filing an Involuntary Petition.**

The two remaining grounds asserted by BB&T as justification for filing the involuntary petition clearly demonstrate that BB&T is improperly using this Court and the involuntary

- 13 -

07906-01.001/609142.doc

petition process to collaterally attack the state court ruling on priority. The two remaining arguments of BB&T include the contention that the state court allegedly did not address the priority issue on the merits and consequently the bankruptcy court should now do so; and that the FDIC has an interest in having its Purchase and Sale Agreement being "properly interpreted" (as opposed to being improperly interpreted by the trial court).

Regarding the state court proceeding, as mentioned above, the trial issues were clearly and succinctly stated by the trial court. BB&T failed to meet its burden of proof regarding the assignment of the Construction Loan to BB&T by the FDIC. As such the trial court ruled that the $12 Million DOT has priority over the $43 Million DOT. This is a ruling on the merits.

BB&T is now attempting to prevent the trial court from issuing its findings of fact, conclusions of law and judgment by asserting that the involuntary petition stays any further action before the trial court. A true and correct copy of BB&T's Response to Plaintiff's Notice of Entity to Which the Automatic Stay Applies, is attached to the Supplemental Holley Declaration as **Exhibit "22"**. A true and correct copy of Plaintiff's Notice of Entity to Which the Automatic Stay Applies is attached to the Supplemental Holley Declaration as **Exhibit "23"**.

Regarding the contention that bankruptcy is necessary to obtain a "proper" interpretation of the FDIC Purchase and Sale Agreement, BB&T is really seeking to improperly utilize the Bankruptcy Court as an appellate court in hopes of reversing the trial court ruling. The proper forum for seeking reversal of a state court judgment is to file an appeal with the Nevada Supreme Court, not to commence an involuntary bankruptcy petition. Movants are unaware of any case law that supports this rationale as justification for filing an involuntary bankruptcy petition.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

- 14 -

07906-01.001/609142.doc

### III    CONCLUSION

Based upon the foregoing, this Court should dismiss the Involuntary Petition for bad faith with an award of attorney's fees and costs to Movants for bringing the Motion. In the alternative, this Court should abstain from exercising its jurisdiction and dismiss the involuntary petition pursuant to 11 U.S.C. § 305(a)(1).

Dated this 16th day of June, 2010.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

*/s/ Richard F. Holley*

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/791-0308
Facsimile: 702/791-1912
*Attorneys for Forouzan, Inc. RPN, LLC, Saiid Forouzan Rad, and Phillip Nourafchan*

**BAILUS COOK & KELESIS, LTD.**

/s/ Julie Sanpei

Julie Sanpei, Esq. (NV Bar No. 5479)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone: 702/385-3788
Facsimile: 702/737-7712
*Attorneys for R&S St. Rose, LLC*

07906-01.001/609142.doc

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Santoro, Driggs, Walch, Kearney, Holley & Thompson, and that on the 16th day of June, 2010, I caused to be served a true and correct copy of the REPLY IN SUPPORT OF THE MOTION TO DISMISS INVOLUNTARY PETITION in the following manner:

☒ (ELECTRONIC SERVICE) Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐ (UNITED STATES MAIL) By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐ (OVERNIGHT COURIER) By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐ (FACSIMILE) That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

/s/ Shannon LePierre
An employee of Santoro, Driggs, Walch, Kearney, Holley & Thompson

07906-01.001/609142.doc