1    Richard F. Holley, Esq. (NV Bar No. 3077)
     Email: rholley@nevadafirm.com
2    Ogonna M. Atamoh, Esq. (NV Bar No. 7589)          E-filed on:  June 24, 2010
     Email: oatamoh@nevadafirm.com
3    SANTORO, DRIGGS, WALCH,
     KEARNEY, HOLLEY & THOMPSON
4    400 South Fourth Street, Third Floor
     Las Vegas, Nevada 89101
5    Telephone:    702/791-0308
     Facsimile:    702/791-1912
6    *Attorneys for Saiid Forouzan Rad, R. Phillip Nourafchan, Forouzan, Inc., and RPN, LLC*

7    Julie Sanpei, Esq. (NV Bar No. 5479)
     Email: jsanpei@bckltd.com
8    BAILUS COOK & KELESIS, LTD.
     400 South Fourth Street, Third Floor
9    Las Vegas, Nevada 89101
     Telephone:    702/385-3788
10   Facsimile:    702/737-7712

11   *Attorneys for R&S St. Rose, LLC*

12

13                    **UNITED STATES BANKRUPTCY COURT**

14                         **DISTRICT OF NEVADA**

15   In re:                                    Case No. BK-S-10-18827-MKN
                                               Involuntary Chapter 7
16   R&S ST. ROSE, LLC,
                                               **THIRD SUPPLEMENTAL**
17              Alleged Debtor.                **DECLARATION OF RICHARD F.**
                                               **HOLLEY, ESQ. IN SUPPORT OF**
18                                             **MOTION TO DISMISS INVOLUNTARY**
                                               **PETITION**
19
                                               Date of Hearing:      June 23, 2010
20                                             Time of Hearing:      9:30 a.m.
                                               Place: Courtroom No. 2, Third Floor
21                                                        Foley Federal Building
                                                          300 Las Vegas Blvd., S.
22                                                        Las Vegas, NV 89101

23                                             Judge: Hon. Mike K. Nakagawa

24

25          I, RICHARD F. HOLLEY, hereby declare under penalty of perjury as follows:

26          1.      I am a shareholder in the law firm of Santoro, Driggs, Walch, Kearney, Holley &

27   Thompson ("Santoro Firm").  I am admitted to practice law before this Court.

28

2.      The Santoro Firm was at all relevant times counsel of record for Saiid Forouzan Rad ("Rad"), Forouzan, Inc, ("Forouzan Inc."), Phillip Nourafchan ("Nourafchan"), RPN, LLC, a Nevada limited liability company ("RPN"), and R&S Investment Group, LLC ("R&S Investment Group"), in case number A574852 pending in Department XI in the Eighth Judicial District Court, Clark County, Nevada and case number A594512 originally filed in Department XIII in the Eighth Judicial District Court, Clark County, Nevada and subsequently consolidated with case number A574852 (collectively the "State Court Actions").  I was lead counsel in the State Court Actions on behalf of Rad, Forouzan Inc., Nourafchan, RPN and R&S Investment.

3.      Forouzan Inc. and RPN are the sole members and managers of R&S St. Rose. Rad is an owner of Forouzan Inc., and Nourafchan is the sole member and manager of RPN.

4.      I have personal knowledge of the matters set forth in this third supplemental declaration except as to those matters based upon information and belief.  As to the matters based upon information and belief, I believe those statements to be true and correct.

5.      I make this third supplemental declaration in support of the Motion to Dismiss the Involuntary Petition commenced by Branch Banking and Trust Company (BB&T") against R&S St. Rose, LLC ("R&S St. Rose").  This declaration supplements the Declaration of Richard F. Holley, Esq., in Support of the Motion to Dismiss Involuntary Petition, filed May 25, 2010 [Dkt. No. 11], the Supplemental Declaration of Richard F. Holley, Esq., in Support Reply in Support of Motion to Dismiss Involuntary Petition filed June 16, 2010 [Dkt. No. 22], and the Second Supplemental Declaration of Richard F. Holley, Esq., in Support of Motion to Dismiss [Dkt. No. 24] ("Holley Second Supplemental Declaration").

6.      Attached is a file stamped copy of the Findings of Fact and Conclusions of Law signed by Judge Gonzalez on June 18, 2010 and entered in the State Court Action on June 23, 2020.   The filed Findings of Fact and Conclusions of Law is attached as continuing **Exhibit "26."**

. . .

. . .

. . .

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1       I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.

3       Dated this 24th day of June, 2010.

5                           /s/ Richard F. Holley
                            RICHARD F. HOLLEY

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

07906-01.001/612909.doc

# EXHIBIT "26"

Electronically Filed
06/23/2010 04:38:51 PM

1    FFCL

2

**CLERK OF THE COURT**

3                     **DISTRICT COURT**

4                 **CLARK COUNTY, NEVADA**

5    ROBERT E. MURDOCK and ECKLEY M.
     KEACH,
6                                                    Case No.:      A574852
                      Plaintiffs,                    Dept. No.:     XI
7
           v.                                        (Consolidated with 09-A-594512-C)
8
     SAIID FOROUZAN RAD, an individual; R.
9    PHILLIP NOURAFCHAN, an individual;
     FOROUZAN, INC., a Nevada corporation; RPN
10   LLC, a Nevada limited liability company; R & S     **Hearing Dates: January 8, 11, 12 & 15, 2010**
     ST. ROSE LLC, a Nevada limited liability                        **March 29-April 2, 2010 and**
11   company; R & S ST. ROSE LENDERS, LLC a                          **April 8, 2010**
     Nevada limited liability company; COLONIAL
12   BANCGROUP INC.; R & S INVESTMENT
     GROUP LLC, a Nevada limited liability
13   company; and DOES I through X, inclusive,

14                     Defendants.

15   AND ALL RELATED CLAIMS AND
     ACTIONS
16
17           **FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

18          This matter having come on for non-jury trial before the Honorable Elizabeth Gonzalez

19   on January 8, 2010, and continuing day to day, based upon the availability of the Court,

20   witnesses, and Counsel, until its completion on April 8, 2010[2] in these consolidated proceedings;

21

22   [1]     The Court has delayed issuing this Order due to BB&T's filing of a Petition for
     Involuntary bankruptcy against R & S St. Rose, LLC on May 13, 2010 in case number Case 10-1
23   8827 pending a motion for stay before this Court by BB&T. Although the Court on May 27,
     2010, requested BB&T file a motion to stay if they intended to take the position that this Court
24   should stay these proceedings, no motion for stay has been received. The Nevada Supreme
     Court has ruled that the bankruptcy automatic stay does not apply to nondebtor defendants.
25   Edwards v. Ghandour, 123 Nev. 105, 159 P.3d 1086 (2007). Accordingly the Court enters this
     Order. It is not the intention of this Court to violate the automatic stay and any application of this
26   Order will not be effective against the Debtor in Bankruptcy until the stay is lifted or the Petition
     dismissed.
27
     [2]     It should be noted that counsel originally indicated the hearing would be a one week trial.
28   This estimate was not accurate and contributed to the non-sequential days required for

RECEIVED
JUN 2 2 2010
CLERK OF THE COURT

1  pertaining to priority and all related issues intertwined with the priority of liens found upon the

2  real property at issue; Cross-Complainant Branch Banking and Trust Company, as successor in

3  interest to Federal Deposit Insurance Corporation, as receiver of Colonial Bank N.A. ("BB&T"

4  or "Colonial"), having been represented by and through its attorneys of record, GERRARD,

5  COX & LARSEN; Defendant R & S ST. ROSE LENDERS, LLC ("R&S Lenders"), having been

6

7  represented by and through its attorneys of record, DAVID J. MERRILL, P.C.; Defendant R & S

8  ST. ROSE, LLC ("R&S"), having been represented by and through its attorneys of record,

9  BAILUS, COOK & KELESIS, LTD.; Defendants SAIID FOROUZAN RAD ("Rad"), R.

10  PHILLIP NOURAFCHAN ("Nourafchan"), FOROUZAN, INC. ("Forouzan), RPN, LLC

11  ("RPN"), and R & S INVESTMENT GROUP, LLC ("R&S Investment"), having been

12  represented by and through their attorneys of record, SANTORO, DRIGGS, WALCH,

13
   KEARNEY, HOLLEY & THOMPSON; Plaintiffs ROBERT E. MURDOCK, ESQ.
14

15  ("Murdock") and ECKLEY M. KEACH, ESQ. ("Keach") having represented themselves in

16  proper person; the Court having read and considered all pleadings and papers on file in the

17  above-captioned case, including all other claims; having reviewed the documents admitted into

18  evidence during the trial and briefs and points and authorities filed by the parties; and having

19  heard and carefully considered the testimony of the witnesses called to testify; the Court with the

20  intention of resolving evidentiary issues pertaining to priority of liens found upon the real

21

22  property at issue hereby enters the following facts and states the following conclusions of law:

23  **INTRODUCTION**

24  This action was initiated on November 3, 2008 when Plaintiffs Murdock and Keach filed

25  a Complaint against Defendants, Rad, Nourafchan, Forouzan, RPN, R&S, and R&S Lenders.  On

26  April 3, 2009, Plaintiffs filed a Second Amended Complaint adding claims against Colonial

27  Bancgroup, LLC, and R&S Investment.

28  ——————————————— (continued)
   completion.

-2-

1    Thereafter, on July 1, 2009, Colonial Bank, N.A. ("Colonial Bank") filed Case No. 09-A-

2    594512-C in which Colonial Bank alleged that its July 31, 2007 Deed of Trust relating to the

3    $43,980,000 construction loan (sometimes "Construction Loan" or "2007 Colonial Bank Deed of

4    Trust") had priority over the September 16, 2005 St. Rose Lenders Deed of Trust relating to its

5
     $12,000,000 loan. An Amended Complaint was filed by Branch Banking and Trust ("BB&T")
6
7    in place of Colonial Bank in which BB&T alleged it was successor in interest to the FDIC as

8    receiver for Colonial Bank. BB&T asserted theories of contractual subrogation, equitable

9    subrogation, replacement, equitable/promissory estoppel, unjust enrichment, misrepresentation

10   and civil conspiracy to seek priority of the 2007 Colonial Bank Deed of Trust over the 2005 St.

11   Rose Lenders Deed of Trust. St. Rose Lenders filed a Counterclaim on October 27, 2009

12
     seeking a declaration that the 2005 St. Rose Lenders Deed of Trust has priority over the 2007
13
14   Colonial Bank Deed of Trust. All actions were consolidated on October 22, 2009.

15   Both St. Rose Lenders and BB&T sought injunctive relief to prevent the other from

16   moving forward with a foreclosure on the property pending a determination of priority of the

17   deeds of trust. The Court granted a mutual Temporary Restraining Order preventing either party

18   from moving forward with foreclosure until the issue of priority was resolved. With the consent

19   of the parties, the Court consolidated the Preliminary Injunction Hearing with a trial on the

20
     merits regarding BB&T's claims for relief for contractual subrogation, equitable subrogation,
21
22   replacement, equitable/promissory estoppel, and unjust enrichment. The parties also consented

23   to an extension of the Temporary Restraining Order until the conclusion of the trial and

24   evidentiary hearing.

25   The trial commenced on January 8, 2010 with the initiation of BB&T's case in chief.

26   The trial continued over the ensuing four (4) months for a total of ten days[3] until April 14, 2010

27

28   _____
     [3]    On March 30, 2010, BB&T disclosed that its last witness Brad Burns, formerly of
     Centex, was not available to testify until April 8, 2010. The Court requested that Plaintiff rest

1    when the Court granted a Rule 52 motion brought by Plaintiffs Murdock and Keach and

2    Defendants Rad, Nourafchan, Forouzan, RPN, St. Rose Lenders, and R&S Investment

3    (sometimes "moving parties").

4         The primary issue raised in the Rule 52 motion was whether BB&T had met its

5    evidentiary burden of proof to demonstrate it received an assignment of Colonial Bank's interest

6    in the 2007 Colonial Bank Deed of Trust. Over objection, the Court admitted into evidence

7    Exhibit 183, a Purchase and Assumption Agreement entered into on August 14, 2009 between

8    the FDIC and BB&T which purported to sell assets of Colonial Bank to BB&T. The Court

9    found that there was no competent, admissible evidence offered by BB&T to establish whether

10    the loan, note and deed of trust at issue were excluded pursuant to Sections 3.5 and/or 3.6 or

11    purchased by BB&T pursuant to Section 3.1 of Exhibit 183.

12         As the finder of fact, the Court found that the Purchase and Assumption Agreement did

13    not clearly transfer the loan, note and deed of trust at issue and called into question BB&T's

14    ability to assert its claims of priority. Specifically, the Court stated:

15

16

17         I've admitted Exhibit 183. I think Exhibit 183, if it included some
         reference to this particular asset or a schedule that had excluded assets that didn't
18         include this asset, might comply with NRS 111.235, which would then put your
         client in a position where it might have some remedy. Without those kinds of
19         things I think we have a potential standing issue, as Mr. Keach has framed it, or
         you know, I guess that's the best way, or successor in – a true successor in interest
20         problem.

21

22         (Transcript of hearing Day 6, March 30, 2010, page 56-57, lines 24-7.) The Court then

23    asked BB&T to return the following day with documentary evidence in addition to Exhibit 183

24    to alleviate the Court's concern as to BB&T's ability to assert its claims of contractual

25    subrogation and replacement.

26         Upon returning to Court the following day, BB&T argued that standing was not one of

27    ————————————————— (continued)
    with the exception of that testimony on March 30, 2010. As a result, the motions pursuant to
28    Rule 52 were made at that time. BB&T's last witness Brad Burns, formerly of Centex, testified
    on April 8, 2010 completing BB&T's presentation of evidence.

1  the issues that the Court identified in its November 23, 2009 minute order to be advanced as part

2  of the expedited hearing on the priority issues. Nevertheless, BB&T reported to the Court that

3  after speaking with the FDIC it found a bulk assignment of security instruments and loan

4  documents recorded on November 3, 2009 in Clark County, which was read into the record

5  pursuant to NRS 111.155 and offered as an exhibit. BB&T also offered into evidence an

6  executed although unrecorded assignment, counsel had prepared with respect to the loan at issue.

7  The Court denied admission of both the bulk assignment as well as the unrecorded assignment

8  into evidence on the basis that neither had been previously disclosed.

9       After the Court denied admission of the above assignments, BB&T moved the Court to

10  reopen evidence. The Court denied BB&T's request. BB&T then moved the Court to substitute

11  in the real party in interest, Colonial Bank and/or the FDIC as receiver of Colonial Bank under

12  Rule 25(c), Rule (21), or Rule 17(a). After briefing on substitution/joinder of the real party in

13  interest, the Court denied BB&T's motion, stating:

14       Exhibit 183 is internally inconsistent and is incomplete. It prevents the
       Court from making a finding that an assignment has occurred of the loan that is at
15       issue. The insufficient and conflicting evidence regarding this assignment is what
       led me to the position that we're currently in, the ruling that I began to make on
16       the 41(b) motions at the time we had this motion presented.
       For that reason and given the particular procedural posture of this case,
17       I'm going to deny the request for substitution of the real party in interest.

18  (Transcript of hearing Day 9, April 13, 2010, page 25, lines 16-25.)

19

20       Counsel for BB&T conceded that if Exhibit 183, the Purchase and Assumption

21  Agreement, was not sufficient evidence, on its face, to establish that BB&T was entitled to

22  priority on the note and deed of trust, then all of its claims must fail:

23       So, again, if it's the position of the Court that Exhibit 183 does not effect
       an assignment of that loan, and that's what you said yesterday, then I don't know
24       why we're even having these discussions about any of the other issues in the case.
       Because if we don't own the loan, we have no rights to make any of these
25       arguments, equitable subrogation, we don't have the right –

26

27       THE COURT: So while you don't agree that I'm right, but you recognize
       that if that is my ruling and I'm going to be consistent, that I have to do the same
28       thing with contractual subrogation.

-5-

1    MR. GERRARD: And replacement and equitable subrogation; right?

2    THE COURT: I'm just -- if you want to skip ahead -- I'm just giving you
3    the opportunity to make –

4    MR. GERRARD: I don't know how it can come out any other way. If
     my--
5
6    THE COURT: -- any other position to me known so I have the
     opportunity to consider anything else that you think might cause those particular
7    claims to be treated differently given my ruling regarding the effect, the
     evidentiary effect of Exhibit 183.
8
9    MR. GERRARD: Well, again, Your Honor -- you know, we went over
     this the other day, but let's be clear about this. If Exhibit 183 does not effect an
10   assignment, if you can't find that that effects an assignment of the loan at issue in
     this case to BB&T, then there's not one more thing for us to talk about.
11
     THE COURT: Okay.
12
13   MR. GERRARD: Because the minute that you rule that this -- that you
     cannot find that this document effected an assignment to my client, then we don't
14   have the right, we have no standing to make the equitable subrogation claim, to
     make the –
15
     THE COURT: It's not a standing issue, Mr. Gerrard.
16
17   (Transcript of hearing Day 10, April 14, 2010, page 25, lines 9-25, page 26, lines 1-18.)

18   Counsel for BB&T continued:

19   "And I told Your Honor yesterday and I told you on the 30th and I told
     you on the 31st that this is the only document that exists pursuant to which any
20   rights to this loan were transferred. If this agreement doesn't transfer it, then
     nothing else has any legal effect, because this is the -- this is the operative
21   document."

22   (Transcript of hearing Day 10, April 14, 2010, page 27, lines 7-12.)

23   Although BB&T repeatedly attempted to couch the issue as one of standing, it is
24
25   not a standing issue. Rather, the defect which prompts the dismissal of BB&T's claims is

26   evidentiary. BB&T failed to meets its burden of proof to establish that the Colonial Bank loan,

27   note and deed of trust at issue in this case were ever assigned to BB&T. The Court has given

28   BB&T ample opportunity to submit proper admissible evidence that the Colonial Bank loan, note

and deed of trust at issue in this case were one of the assets acquired by BB&T when it

purchased some of the Colonial Bank assets. BB&T instead relied upon the language of the

Purchase and Assumption Agreement, and no other admissible evidence, documentary or

testimonial. The Court hereby finds that Exhibit 183, the Purchase and Assumption Agreement,

was not sufficient evidence, on its face, to establish that BB&T was assigned the 2007 Colonial

Bank Deed of Trust.

Based upon the testimony and documentary evidence presented during the hearing and

for good cause appearing, pursuant to Rules 50 and 52, the Court finds, concludes, orders,

adjudges and decrees as follows:

## FINDINGS OF FACT

1.      R&S was formed in August 2005 to land-bank thirty-eight acres of real property

located at St. Rose Parkway and Spencer Road in Henderson, Nevada (the "Property") for

Centex Homes ("Centex").

2.      St. Rose Lenders was formed for the purpose of borrowing funds from individual

lenders and then loaning those same funds to R&S and securing the loans with a deed of trust on

the Property.

3.      On August 26, 2005, R&S purchased the Property for $45,131,414.11 with the

intention of flipping it to Centex Homes a year later.

4.      Centex Homes acquired an option to purchase the Property for $54,102,000.00

from R&S by making a series of non-refundable deposits to R&S that totaled approximately

$8,110,700.00.

5.      To purchase the Property, R&S obtained funds from three different sources: (1)

Colonial Bank; (2) Centex non-refundable deposits; and (3) St. Rose Lenders, who obtained the

funds from private lenders, including the plaintiffs, Murdock and Keach.

6.      R&S applied $8,100,000 from the non-refundable earnest money deposits from

-7-

Centex towards the purchase price for the Property.

7.    R&S also borrowed $12,300,000 from St. Rose Lenders.

8.    R&S obtained funds from Colonial Bank to finance the purchase of the Property: first, R&S obtained a $29,350,250.00 loan from Colonial (the "First Colonial Loan");

9.    R&S and R&S Lenders are each comprised of the same two members and the same two managers, those being Forouzan and RPN. The owner and/or president of Forouzan is Rad. The owner and/or manager of RPN is Nourafchan.

10.    Rad and Nourafchan (individually and in their representative capacities) were/are the decision-makers and at all times herein they owned and/or controlled Forouzan, RPN, R&S, and R&S Lenders, respectively.

11.    In connection with the First Colonial Loan, Rad and Nourafchan (individually, and in their representative capacities) signed a promissory note in favor of Colonial for $29,305,250 (the "First Colonial Note") as well as a first position deed of trust in that amount that recorded on August 26, 2005 as Document No. 05282 in Book 20050826 of the Official Records, Clark County, Nevada (the "First Colonial DOT") all of which are dated August 16, 2005.

12.    The loan was for a period of twelve months with an option to extend the loan for an additional six months.

13.    Prior to the First Colonial Loan, Rad and Nourafchan, through various entities they owned and controlled, had taken out eleven (11) different land loans from Colonial between 2001 and 2005. Each and every one of the eleven previous land loans, as well as the First Colonial Loan, had been secured by a first position deed of trust as collateral. Colonial did not make land loans unless secured by a first priority deed of trust. This was confirmed with testimony of Richard Yach ("Yach"), Marty Singer ("Singer") and Stephen Novacek ("Novacek").

-8-

14.    In these prior transactions, Colonial informed Rad and Nourafchan[4] that Colonial required a first priority deed of trust as collateral on all loans secured by land. In addition to Colonial's first deed of trust requirement, Rad and Nourafchan had also been told by Colonial, and understood, that Colonial used a loan to value ratio to determine the amount Colonial was willing to lend on a land loan. Rad and Nourafchan understood that the loan to value ratio was determined by comparing all debt, including the proposed loan, against the appraised fair market value of the land being financed ("loan to value ratio")[5], and that using this loan to value ratio Colonial would lend a maximum of 65% for unimproved land and 75% for land to be improved using the loan proceeds.

15.    In each of the eleven loans obtained by Rad and Nourafchan from Colonial Bank between 2001 and 2005, Colonial Bank (i) required a first priority deed of trust, and (ii) would only allow total debt against the property of 65% of the fair market value of the property being financed.

16.    In these prior transactions, Colonial Bank was aware that Rad and Nourafchan would bring in other private investors to participate in the transactions.

17.    Nearly one month later and without the knowledge of Colonial, Rad and Nourafchan (individually, and in their representative capacities) signed a promissory note in favor of R&S Lenders for $12,000,000.00 (the "R&S Lenders Note") as well as a second

---

[4]    Rad testified that Colonial Bank had told him the bank required a first deed of trust on all land loans. See Transcript of Proceedings, Day 4 (Testimony of Rad) at pages 15:2-4 (Q. "They told you that that was a requirement on land loans, that they have a first deed of trust, didn't they?" A. "Yes, sir."); 28:18-21 (Q. "And at the time that loan was made you understood that the bank had a requirement that it would only loan money if it's secured by a first deed of trust; correct?" A. "Yes, sir. They mentioned it.")

[5]    See Transcript of Proceedings, Day 4 (Testimony of Rad) at pages 72:22 – 73:1(Q. "Well, you've already testified four separate times in your testimony that the way that you arrive at the loan-to-value ratio was to add up all the debt against the property and compare it to the value of the property, haven't you?" A. "That's correct".....Q. "That's what I said. You have to add up all the debt against the property and compare it against the appraised value of the property to arrive at your loan-to-value ratio; correct?" A. "Yes, sir.")

-9-

1   position deed of trust in that amount that recorded on September 16, 2006 as Document No.

2   02881 in Book 20050916 of the Official Records, Clark County, Nevada (the "R&S Lenders

3   DOT").

4       18.     At that time, the First Colonial DOT was in a first position on the Property and

5   the R&S Lenders DOT was in a second position lien on the Property.

6

7       19.     Rad, Nourafchan, and/or their agents raised the $12,000,000 that R&S Lenders

8   loaned R&S to purchase the Property by soliciting private investors that included, among others,

9   family members, friends, acquaintances, including Murdock and Keach (collectively referred to

10  as "investors"). Each of the investors were told that they were investing in a second priority

11  loan, subject to the First Colonial Loan. [6]

12      20.     In late August 2005 Murdock loaned Rad and Nourafchan $100,000.00 towards

13  the purchase of the Property for which he received a note titled "Promissory Note Secured by

14  Deed of Trust" dated September 1, 2005 executed by R&S Lenders.

15

16      21.     In late August 2005 Keach loaned Rad and Nourafchan $500,000.00 toward the

17  purchase of the Property for which he received a Promissory Note Secured by Deed of Trust

18  dated September 1, 2005 executed by R&S Lenders.

19      22.     The Promissory Notes Secured by Deed of Trust were executed by R&S Lenders

20  by its managers, Defendants Forouzan and RPN, by their managers, Defendants Rad and

21  Nourafchan.

22

23      23.     Neither Murdock nor Keach ever received evidence that their Promissory Notes

24  were secured by a Deed of Trust.

25      24.     According to Rad, Murdock and Keach's Notes for a total of $600,000 are within

26  _____
    [6]     While each investor apparently received a promissory note in the amount that R&S

27  Lenders borrowed, each investor did not receive an individual deed of trust securing their interest
    against the Property. The R&S Lenders DOT only names R&S Lenders as the secured party.

28  Rad and/or Nourafchan believe that the R&S Lenders DOT is a "collective" deed of trust that
    secures all of the investors that contributed funds for a second trust deed.

1   that $12,300,000 Deed of Trust.

2   25.    St. Rose Lenders recorded the St. Rose Lenders Deed of Trust on September 16,

3   2005.

4   26.    In August of 2006, Centex Homes unexpectedly walked away from its option to

5   purchase the Property and forfeited its $8.1 million in non-refundable deposits to R&S.

6   27.    On March 19, 2007, R&S St. Rose and Colonial Bank entered into a Modification

7   to Deed of Trust and Security Agreement and Fixture Filing with Assignment of Rents (the

8   "Modification") and an Amendment to Promissory Note Secured by Deed of Trust (the

9   "Amendment"), in which R&S and Colonial Bank agreed to extend the maturity date of the Note

10  for a few months, until August 25, 2007.

11  28.    R&S was able to avoid foreclosure of the First Colonial DOT by extending the

12  maturity date of the First Colonial Note until August of 2007.[7]

13  29.    Nevada Title handled the Modification closing transaction and required both

14  R&S, as the owner, and St. Rose Lenders, as the beneficiary, to execute an agreement

15  subordinating the St. Rose Lenders Deed of Trust.

16  30.    On May 17, 2007, R&S and St. Rose Lenders executed a Subordination

17  Agreement.

18  31.    Nevada Title recorded both the Modification and the Subordination Agreement on

19  June 4, 2007.

---

[7]    Rad and Nourafchan extended the maturity date by exercising a one-time six (6) month
extension as set forth in the First Colonial Note.  Colonial agreed to a second extension through
a Modification executed by Rad and Nourafchan in March of 2007.  It is important to note that
while the Modification was executed in March of 2007, the Subordination Agreement Colonial
required in connection with the Modification was not executed by Rad and Nourafchan until
almost two months later in May of 2007.  Rad and Nourafchan's execution of the Subordination
Agreement post-closing of the Modification is consistent with Brenda Burns' testimony that in
her past dealings with Rad and Nourafchan they would execute documents post-closing as
needed.  Specifically, their execution of the Subordination Agreement post-closing supports Ms.
Burns' testimony that Rad and/or Nourafchan agreed to release the R&S Lenders DOT in
connection with obtaining the construction loan.

32.    Prior to expiration of the extended maturity date for the Modification, Colonial Bank and R&S agreed to the terms of a new construction loan for the development of the Property ("Construction Loan").

33.    By the Spring of 2007, it was apparent to Rad and Nourafchan that they would be unable to close a sale or refinance the Property prior to the August, 2007 maturity date of the First Colonial Loan.

34.    In late May or early June of 2007, Rad and Nourafchan approached Colonial with a request for a new loan to be used to repay the First Colonial Loan and for additional development funding to improve the Property. Rad and Nourafchan believed that by selling improved lots rather than raw land, R&S could more easily sell the Property, repay the loans and make a return on their investment.

35.    At the time, Yach, testified he knew Rad and Nourafchan were land investors and land speculators, not developers.

36.    Yach also testified that if the 2005 loan had gone into default and the Construction Loan Agreement had not been entered into, it would likely have affected Colonial Bank's reserve requirements and its ability to extend further loans.

37.    After considering Rad and Nourafchan's proposed plan to develop the Property, Yach, informed Rad and Nourafchan that Colonial's loan to value ratio for a construction land loan on the Property would be 75% by comparing all debt to the value of the Property. Rad testified that he understood the total of all debt against the property could not exceed 75% of the Property's appraised value in order to obtain the new loan he was seeking from Colonial.[8] Since the R&S Lenders DOT was recorded debt against the Property, Rad and Nourafchan would not possess the 25% equity to qualify for the new construction loan unless the R&S Lenders DOT

---

[8]    See Transcript of Proceedings, Day 4 (Testimony of Rad) at pages 61:15-19, 73:20-24; 78:19-22.

1    was released.[9]

2      38.    On June 20, 2007, Singer sent the Loan Approval Request and a preliminary title

3    report (which discloses the R&S Lenders DOT as exception 37) to Novacek, an outside attorney

4    used by Colonial to draft loan documents. As the Loan Approval Request indicated that Colonial

5    required a first position deed of trust on the Property as collateral for the new loan, Novacek

6

7    prepared loan documents intended to create and secure a first position deed of trust on the

8    Property.

9      39.    At Colonial's request, an appraisal of the Property was performed on or about

10    June 25, 2007. At that time, the Property had an "as is" market value of $45,530,000 and a

11    "upon completion of site improvements" bulk value of $58,640,000. Taking into consideration

12    the appraised bulk value of $58,640,000 and based upon Colonial's 75% loan to value maximum

13

14    and Colonial's understanding that the R&S Lenders DOT was to be released, the amount of the

15    new loan was reduced from $47,740,000 to $43,980,000.

16      40.    Cheryl Fricker, the Portfolio Manager of the Commercial Real Estate Department

17    and assistant to Yach, prepared a Loan Commitment letter dated July 24, 2007, which indicated

18    that the security for the loan is a "First deed of trust on the subject property generally located at

19    Seven Hills and St. Rose Parkway."

20

21      41.    Singer testified she sent the Loan Commitment letter to Rad and Nourafchan by

22    facsimile transmission.

23      42.    Rad and Nourafchan denied receiving the Loan Commitment letter.

24      43.    Singer testified she did not keep a copy of the fax confirmation.

25      44.    Both Yach and Singer testified they remembered seeing a copy of the Loan

26    Commitment letter signed by Rad and Nourafchan; however, Colonial could not locate the

27

28

---

[9]    See Transcript of Proceedings, Day 4 (Testimony of Rad) at pages 77:24 – 78:22.

1   signed copy.[10]

2       45.    Rad and Nourafchan denied signing the Loan Commitment letter.

3       46.    At trial, although BB&T presented an unsigned Loan Commitment Letter dated

4   July 24, 2007 which purports to indicate Rad and Nourafchan understood Colonial Bank wanted

5
6   to have a First Deed of Trust on the property, there is no credible evidence to indicate the Loan

7   Commitment Letter was seen or executed by Rad or Nourafchan.

8       47.    Neither BB&T nor Colonial Bank produced a Loan Commitment Letter executed

9   by Rad and/or Nourafchan.

10       48.    While Singer testified that she saw a signed Loan Commitment Letter (a faxed

11   copy) executed by Rad and Nourafchan, the Court finds the testimony to not be credible.

12       49.    No credible evidence exists that the document was sent to Rad and/or

13
14   Nourafchan.

15       50.    Yach and Singer testified that the Construction Loan documents governed the

16   understanding of the parties involved in the transaction and therefore the Loan Commitment

17   Letter was superseded by the Construction Loan Documents.

18       51.    As a condition to the Construction Loan, Colonial Bank did not request that St.

19   Rose Lenders reconvey or subordinate the St. Rose Lenders Deed of Trust or convert the same to

20
21   equity.

22       52.    The Construction Loan was for eighteen months with an option to extend the term

23   for an additional six months.

24       53.    The terms of the Construction Loan were evidenced by a Construction Loan

25

26   ───────────
[10]    Colonial's loan file is missing the signed copy of the Loan Commitment letter as well as
a signed copy of the lender's escrow instructions signed by Nevada Title. Nevada Title's escrow

27   file contains the latter and Brenda Burns acknowledges her receipt of the same. Not surprisingly,
Rad and Nourafchan deny ever receiving the Loan Commitment letter that indicates Colonial

28   required a first position deed of trust on the Property as collateral for the new $43,980,000
construction loan.

1    Agreement, Promissory Note Secured by Deed of Trust, and the Colonial Bank Deed of Trust

2    (collectively "Construction Loan Documents"), all of which are dated July 27, 2007.

3        54.    Novacek prepared July 27, 2007 escrow instructions to Nevada Title that stated

4    that Nevada Title could close the transaction when it could issue a title policy to the bank

5
     showing only certain exceptions and St. Rose Lenders' $12,300,000 Deed of Trust was not one
6

7    of the permitted exceptions.

8        55.    Colonial Bank's counsel testified he intended the escrow instructions to mean that

9    the title company could not record and close the transaction if it could not issue a title policy

10   subject to allowed exceptions only.

11       56.    Novacek further testified that in order for Nevada Title to comply with his escrow

12
     instructions, it had to issue a title policy without showing the St. Rose Lenders Deed of Trust as
13
     an exception.
14

15       57.    Although Colonial Bank instructed Nevada Title Company that the title policy

16   could only be subject to certain exceptions, how that was accomplished was left to the discretion

17   of the title company.

18       58.    Colonial Bank relied on the title company to issue the title policy as instructed by

19   Novacek.

20
         59.    As long as Colonial Bank was provided with a title policy that did not include the
21
     St. Rose Lenders Deed of Trust as an exception, Yach testified he did not care how it was
22

23   accomplished.

24       60.    Brenda Burns also agreed Colonial Bank did not specify how Nevada Title was

25   supposed to accomplish or satisfy the requirements.

26       61.    The witnesses confirmed that Nevada Title satisfied the title policy parameters

27   required by Colonial Bank.

28
         62.    Nevada Title insured the deed of trust as instructed, without St. Rose Lenders'

- 15 -

1    Deed of Trust as an exception.

2    63.    Colonial Bank's attorney testified that the bank wanted a title insurance policy

3    insuring the 2007 Colonial Bank Deed of Trust without showing the St. Rose Lenders Deed of

4    Trust as an exception, and that is what it received.

5
     64.    On July 27, 2007, Colonial Bank and R&S entered into the Construction Loan.
6
     65.    On or about July 31, 2007, Colonial Bank closed the transaction in the
7
8    approximate amount of $43,000,000 with the security of its Second Deed of Trust.

9    66.    At the closing on July 31, 2007, the Construction Loan proceeds paid for the

10   following: (1) a $439,800.00 loan fee to Colonial Bank; (2) the payoff of Colonial Bank's 2005

11   loan in the amount of $29,779,628.72; (3) a reconveyance fee of $45.00; (4) $3,000.00 for the

12   appraisal; (5) $500.00 for an appraisal review fee; (6) $900.00 for an underwriting fee; and (7)
13
     $2,808,000.00 as an interest reserve.
14
15   67.    The total encumbrance added to the Property at the time of closing was

16   $33,031,873.72, nearly $4 million more in additional debt than agreed to by R&S and Colonial

17   Bank in 2005.

18   68.    By reason of its collection of additional funds in the nature of the loan fee, payoff

19   of the 2005 loan, reconveyance fee, appraisal fee, underwriting fee and interest reserve sums,

20   Colonial Bank was the recipient of and beneficiary of the majority of the additional debt.
21
22   69.    St. Rose Lenders was not a party to the Construction Loan Documents.

23   Moreover, St. Rose Lenders was not a guarantor.

24   70.    The Construction Loan was personally guaranteed by both Rad and Nourafchan.

25   71.    Colonial Bank never communicated to Rad, Nourafchan, R&S or St. Rose

26   Lenders that it required a first priority deed of trust for the Construction Loan.

27   72.    The Closing Instructions were never transmitted or communicated to Rad,
28
     Nourafchan, R&S or St. Rose Lenders.

-16-

73.     Brenda Burns, the Nevada Title escrow officer who closed the loan transaction, never transmitted, communicated or discussed the Closing Instructions with Rad, Nourafchan, R&S or St. Rose Lenders.

74.     At no time prior to the closing of the Construction Loan did Brenda Burns discuss with Rad, Nourafchan, R&S or St. Rose Lenders that reconveyance of the St. Rose Lenders Deed of Trust was a condition to closing of the loan transaction.

75.     At no time prior to the closing of the Construction Loan did Colonial Bank discuss with Rad, Nourafchan, R&S or St. Rose Lenders that reconveyance of the St. Rose Lenders Deed of Trust was a condition to closing of the loan transaction.

76.     Yach testified he did not recall telling Rad or Nourafchan that Colonial Bank required a First Deed of Trust as a condition to providing the Construction Loan.

77.     Yach also testified Rad never told him the St. Rose Lenders Deed of Trust would be converted to equity and neither Rad nor Nourafchan said that the St. Rose Lenders Deed of Trust would be released.

78.     Brenda Burns testified she could not specifically remember what words either she or Rad used to allegedly discuss what was going to happen with the St. Rose Lenders Deed of Trust prior to closing the Construction Loan Agreement.

79.     Rad testified that he was never told by anyone on behalf of Colonial Bank or Nevada Title that the St. Rose Lenders Deed of Trust would have to be reconveyed, subordinated or converted to equity.

80.     There is no evidence that Colonial Bank or BB&T informed Nourafchan that the St. Rose Lenders Deed of Trust would have to be reconveyed, subordinated or converted to equity.

81.     The Escrow Instructions were not given or shown to Rad, Nourafchan, R&S or St. Rose Lenders.

- 17 -

82.   At the time of closing the Construction Loan, Nevada Title was an agent for Old Republic Title Insurance Company.

83.   Neither Rad, Nourafchan, R&S, nor St. Rose Lenders ever represented or agreed to a reconveyance of the St. Rose Lenders' Deed of Trust.

84.   The evidence demonstrates no agreement was reached for R&S or St. Rose Lenders to reconvey the St. Rose Lenders deed of trust.

85.   Principals from St. Rose Lenders and R&S St. Rose testified that the entities did not agree, and could not have agreed, to a reconveyance of the St. Rose Lenders Deed of Trust and there is no signed document indicating otherwise.

86.   Colonial Bank did not condition its extension of the Construction Loan on its receipt of a first deed of trust.

87.   Colonial Bank did not convey any intent to receive a first deed of trust to either R&S, St. Rose, Lenders, Rad, or Nourafchan.

88.   Although loan documents for the 2005 loan and the modification stated Colonial Bank would have a first lien, the Construction Loan Agreement did not.

89.   Colonial Bank did not negotiate the requirement for a first deed of trust in the Construction Loan Agreement, Deed of Trust or Promissory Note Secured by Deed of Trust.

90.   Colonial Bank relied on the issuance of an ALTA lender's policy of title insurance in the amount of $43,980,000.00 insuring the Deed of Trust as a lien on the property, which did not show as an exception the $12,300,000.00 St. Rose Lenders Deed of Trust.

91.   Colonial Bank received such a policy from Commonwealth Land Title Insurance Company on July 31, 2007 as Policy No. 562-Z093126.

92.   The ALTA lender's policy of title insurance was purchased by R&S for the benefit of Colonial Bank.

93.   R&S paid $35,184.00 for the policy of title insurance for the benefit of Colonial

- 18 -

1    Bank.

2        94.    Following closing, Colonial Bank did not request confirmation that a

3    reconveyance had been obtained; it checked only to verify the title insurance policy did not

4    include the St. Rose Lenders Deed of Trust as an exception.

5        95.    Singer relied upon the title policy to insure the St. Rose Lenders Deed of Trust

6    was not identified as an exception. Singer did nothing to determine whether  Colonial Bank had a

7    first position Deed of Trust.

8        96.    Counsel for Colonial Bank did nothing to determine that Colonial Bank had a first

9        96.    Counsel for Colonial Bank did nothing to determine that Colonial Bank had a first

10    Deed of Trust other than review the title insurance policy.  He did not ask for copies of any

11    reconveyance after closing because he relied on the title insurance policy.

12        97.    When money was released to R&S for construction, the only thing Singer did to

13    determine whether Colonial Bank was in a first position was read the title policy.

14

15        98.    When funds were disbursed, Colonial Bank did not get an endorsement from the

16    title company insuring the lien was still in position.

17        99.    Yach testified he relied on the title policy to determine whether Colonial Bank

18    was in first position.

19        100.    Reconveyance of the St. Rose Lenders Deed of Trust was not a condition for

20    closing the Construction Loan transaction.

21

22        101.    If reconveyance of the St. Rose Lenders Deed of Trust had been a condition of the

23    Construction Loan, it would have been stated as such in the loan documents.

24        102.    If reconveyance had been a material term, Colonial Bank should have obtained a

25    separate agreement from St. Rose Lenders prior to closing.

26        103.    There is no proof of any executed agreement or consent by St. Rose Lenders to

27    reconvey.

28        104.    Nevada Title closed its Construction Loan file without a reconveyance from St.

- 19 -

1    Rose Lenders.

2        105.   Nevada Title never had anything from St. Rose Lenders in writing stating it would

3    provide a reconveyance or release.

4        106.   A July 9, 2008 email was the first written communication from Nevada Title with

5    Rad regarding reconveyance of the St. Rose Lenders Deed of Trust when Nevada Title learned

6

7    the St. Rose Lenders Deed of Trust was still a first Deed of Trust,

8        107.   On July 9, 2008, Brenda Burns contacted Rad and asked Rad to reconvey the St.

9    Rose Lenders Deed of Trust.

10        108.   Rad refused to reconvey the St. Rose Lenders Deed of Trust.

11        109.   Prior to that time, Brenda Burns testified she thought St. Rose Lenders would

12    prepare a reconveyance of the St. Rose Lenders Deed of Trust because it was the beneficiary.

13

14        110.   In July 2008, Nevada Title prepared a reconveyance even though it was not the

15    beneficiary of the Deed of Trust.

16        111.   Subordination was brought up for the first time in June or July 2009 when it was

17    proposed by Nevada Title.

18        112.   Subordination of St. Rose Lenders' Deed of Trust would have been inconsistent

19    with Novacek's escrow instructions.

20        113.   Novacek testified that Nevada Title assumed the risk by closing without a

21    reconveyance.

22

23        114.   Nevada Title assumed the risk of closing the Construction Loan transaction

24    without a reconveyance from St. Rose Lenders.

25        115.   The St. Rose Lenders Deed of Trust was never reconveyed or subordinated.

26        116.   The St. Rose Lenders Deed of Trust, which was recorded on September 2005, has

27    priority over Colonial Bank's 2007 Deed of Trust, which was recorded nearly two (2) years later

28    in July 2007.

-20-

117.    On September 5, 2008, Nevada Title confirmed that St. Rose Lenders Deed of Trust had priority over Colonial Bank's 2007 Deed of Trust.

118.    There was no showing by BB&T that because the managing officers of Forouzan and RPN, and the managing members of R&S and St. Rose Lenders were the same, that they can be treated as the same entity.

119.    A uniformity of owners or interest alone is insufficient to demonstrate that entities are anything other than valid, separate or independent corporate entities.

120.    Colonial Bank and Nevada Title previously recognized that R&S and St. Rose Lenders were distinct and separate entities in dealing with modification of the first Colonial Bank loan when St. Rose Lenders was required to agree to and execute the Subordination Agreement.

121.    Since St. Rose Lenders, was not a party to either the 2007 Colonial Bank Deed of Trust or the Construction Loan Agreement, it is not required to subrogate its Deed of Trust.

122.    An agreement which prejudices lien holders or impairs their security requires their consent.

123.    St. Rose Lenders did not consent to subrogate its Deed of Trust.

124.    On September 22, 2008, Colonial Bank obtained a new appraisal of the Property. The "as is" value of the Property at that time was $37,860,000.00.

125.    R&S was unable to complete the development of the Property and on April 28, 2009, Colonial Bank recorded a Notice of Default and Election to Sell.

126.    Colonial Bank's Notice of Default and Election to Sell only indicated failure to pay under the terms of the promissory note as the reason for default.

127.    In or about August 2009, the FDIC took over Colonial Bank as receiver.

128.    An October 20, 2009 appraisal of the Property listed its value at $23,555,000.00 resulting in an over-leveraged amount of roughly $22,000,000.

129.    The FDIC provided a Purchase and Assumption Agreement to BB&T on August 14, 2009.

130.    BB&T's rights to assert claims against the Defendants would have to arise from the August 14, 2009 Purchase and Assumption Agreement.

131.    The Purchase and Assumption Agreement provides the following with respect to the purchase of Colonial Bank assets by BB&T:

> 3.1    Assets Purchased by Assuming Bank. With the exception of certain assets expressly excluded in Sections 3.5 and 3.6, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing. Schedules 3.1 and 3.1a attached hereto and incorporated herein sets forth certain categories of Assets purchased hereunder. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1....

132.    Although the Purchase and Assumption Agreement states that there are schedules attached showing the assets purchased, BB&T indicated at the time of trial that no schedules had been prepared or existed.

133.    The purchased Assets were sold in an "as is" condition:

> 3.3    Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

134.    The Purchase and Assumption Agreement states that certain types of assets were excluded from the sale of assets to BB&T and the types of excluded assets are identified in

1  Sections 3.5 and 3.6:

2      3.5    Assets Not Purchased by Assuming Bank. This Assuming Bank does not
purchase, acquire or assume, or (except as otherwise expressly provided in this
3  Agreement) obtain an option to purchase, acquire or assume under this Agreement:

4      . . .

    (b)    any interest, right, action, claim, or judgment against ... (iv) any other
5  Person whose action or inaction may be related any loss (exclusive of any loss resulting
from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the
6  Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events
giving rise to any such claim shall have occurred on or before Bank Closing, regardless
7  of when any such claim is discovered and regardless of whether any such claim is made
with respect to a financial institution bond, banker's blanket bond, or any other insurance
8  policy of the Failed Bank in force as of Bank Closing.

9      . . .

10     3.6 Retention or Repurchase of Assets Essential to Receiver.
    (a) The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank
11 agrees, at the request of the receiver set forth in a written notice to the Assuming Bank, to
assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right,
12 title and interest in and to, any Asset or by the Receiver in its discretion (together with all
Credit Documents evidencing or pertaining thereto), which may include any Asset or
13 asset that the Receiver determines to be:

14     . . .

    (ii) the subject of any investigation relating to any claim with respect to any item
15 described in Section 3.5(a) or (b), or the subject of, or potentially the subject of any legal
proceedings;
16

17 135.    The Purchase and Assumption Agreement does not indicate whether the 2007

18 Colonial Bank Deed of Trust, that was the subject of pending litigation involving allegations of

19 fraud, was included as an excluded asset.

20 136.    Based upon the fact that legal proceedings were pending which included

21 allegations of fraud at the time the Purchase and Assumption Agreement was entered into, the

22
23 2007 Colonial Bank Deed of Trust may fall into the category of assets which may be

24 excluded from the FDIC sale to BB&T as defined in Sections 3.5 and 3.6.

25 137.    BB&T presented no witness who could competently testify about the Purchase

26 and Assumption Agreement.

27 138.    The Purchase and Assumption Agreement is internally inconsistent and

28 incomplete, and prevents the Court from making a finding as to whether an assignment of the

-23-

1    loan at issue has occurred.

2    139.    At the time that BB&T entered into the Purchase and Assumption Agreement,

3    substantial actual and constructive notice information regarding the disputed priority

4    status of the

5    2007 Colonial Bank Deed of Trust existed: (1) the actions by both Colonial Bank and

6    
7    Murdock and Keach were pending, for which public information exists was already available;

8    and (2) a check of the recorded records for the property would have indicated the first position

9    R&S St. Rose Lenders' Deed of Trust.

10    140.    "Person" is defined in the Assumption Agreement as any individual, corporation,

11    partnership, joint venture, association, joint-stock company, trust, unincorporated organization,

12    or government or any agency or political subdivision thereof, excluding the Corporation.

13    
14    141.    At the time of the execution of the Purchase and Assumption Agreement, there

15    were legal proceedings and claims pending in the Eighth Judicial District Court by both Colonial

16    Bank and Murdock and Keach regarding the

17    142.    The specific rights to "actions or claims" which were mentioned in Section 3.5(b)

18    are absent from the listing of purchased assets.

19    143.    BB&T has not shown that the claims or causes of action against the Defendants

20    being pursued by BB&T belong to BB&T and it is the successor in interest with the ability to

21    
22    assert these claims against the Defendants.

23    144.    Since BB&T has not proved that it owns the actions or claims asserted herein, it

24    does not have the ability to assert the claims set forth in its Second Amended Complaint.

25    145.    Any of the foregoing Findings of Fact which constitute Conclusions of Law shall

26    be deemed as Conclusions of Law.

27    **CONCLUSIONS OF LAW**

28    The Court concludes as follows:

-24-

1.    The Court has jurisdiction over the parties and venue is proper in this Court.

2.    BB&T has failed to meet its burden of proof to establish that the Second Deed of Trust was transferred or assigned by the FDIC to BB&T.

3.    BB&T is not entitled to relief on its claim for equitable subrogation since it has not demonstrated it is a successor in interest.

4.    BB&T is not entitled to relief on its claim for contractual or conventional subrogation since it has not demonstrated it is a successor in interest.

5.    BB&T is not entitled to relief on its claim for equitable replacement since it has not demonstrated it is a successor in interest.

6.    NRS 111.320 recognizes the preference given to documents recorded earlier in time which possess superior rights over those that follow.

7.    R & S St. Rose Lenders' Deed of Trust should retain its priority over the 2007 Colonial Bank Deed of Trust since BB&T has not demonstrated it is a successor in interest with the ability to assert these claims.

8.    BB&T has not demonstrated that it has been assigned the interest in the 2007 Colonial Bank Deed of Trust at issue and therefore has not shown it has the ability to assert the claims presented in the Second Amended Complaint filed by Colonial Bank on October 7, 2009.

9.    BB&T's ability to assert claims against the Defendants would have to arise from the rights it acquired as an asset purchaser pursuant to the August 14, 2009 Purchase and Assumption Agreement.

10.    The Purchase and Assumption Agreement specifically excluded actions and claims against any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, from the Colonial Bank assets purchased from the FDIC.

-25-

11.    BB&T has not demonstrated that the claims or causes of action against the Defendants being pursued by BB&T herein belong to BB&T and it is the real party in interest with the ability to assert equitable claims against the Defendants.

12.    NRS 111.205 states, "No estate or interest in lands, other than for leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall be created, granted, assigned, surrendered or declared after December 2, 1861, unless by act or operation of law, or by deed or conveyance, in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by the party's lawful agent thereunto authorized in writing."

13.    NRS 111.235 states, "Every grant or assignment of any existing trust in lands, goods or things in action, unless the same shall be in writing, subscribed by the person making the same, or by his or her agent lawfully authorized, shall be void."

14.    NRS 111.205 and/or NRS 111.235 apply to the purchase, transfer and assignment, if any, of the 2007 Colonial Bank Deed of Trust from the FDIC to BB&T.

15.    BB&T was required to establish with competent, admissible evidence that the purchase, transfer and assignment, if any, of the 2007 Colonial Bank Deed of Trust from the FDIC to BB&T was in writing and signed by the FDIC.

16.    BB&T failed to meet its burden of proof and presented no evidence, written, oral or otherwise, that the 2007 Colonial Bank Deed of Trust was assigned by the FDIC to BB&T in the Purchase and Assumption Agreement.

17.    The Purchase and Assumption Agreement, Exhibit 183, does not comply with the requirements of either NRS 111.205 or NRS 111.235 as to the 2007 Colonial Bank Deed of Trust.

18.    NRS 111.320 recognizes the preference given to documents recorded earlier in time which possess superior rights over those that follow.

- 26 -

1    19.    A party must invoke equity to obtain relief from the established order dictated by

2    a recording system.

3    20.    Recording statutes provide 'constructive notice' of the existence of an outstanding

4    interest in land, thereby putting a prospective purchaser on notice that he may not be getting all

5    he expected.

6

7    21.    Constructive notice is that which is imparted to a person upon strictly legal

8    inference of matters which he necessarily ought to know, or which, by the exercise of ordinary

9    diligence, he might know.

10    22.    Colonial Bank did not have a reasonable expectation that it would receive a

11    reconveyance of the St. Rose Lenders Deed of Trust following the closing of the Construction

12    Loan transaction only that it would receive a policy of title insurance, which it did receive.

13

14    23.    Nevada Title insured the 2007 Colonial Bank Deed of Trust as instructed, without

15    St. Rose Lenders' Deed of Trust as an exception.

16    24.    Reconveyance of the St. Rose Lenders Deed of Trust was not a condition for

17    closing the Construction Loan transaction.

18    25.    If reconveyance of the St. Rose Lenders Deed of Trust had been a condition of the

19    Construction Loan, it would have been stated as such in the loan documents.

20

21    26.    If reconveyance had been a material term, Colonial Bank would have obtained a

22    separate agreement from St. Rose Lenders prior to closing.

23    27.    There is no proof of any executed agreement or consent by St. Rose Lenders to

24    reconvey.

25    28.    The Court will grant the declaratory relief requested in St. Rose Lenders' First

26    Cause of Action.

27    29.    St. Rose Lenders' Deed of Trust should retain its priority over the 2007

28    Colonial Bank Deed of Trust.

- 27 -

1    30.    The Mutual Temporary Restraining Orders issued on November 23, 2009

2    shall be dissolved and St. Rose Lenders may proceed with its foreclosure sale of the Property.

3    31.    If any conclusions of law are properly findings of fact, they shall be treated as

4    if appropriately identified and designated.

5    DATED this 18 day of June, 2010.

6

7

8    _____
     DISTRICT COURT JUDGE

9    **Certificate of Service**

10    I hereby certify that on or about the date filed, this document was copied through e-mail,
      or a copy of this Order was placed in the attorney's folder in the Clerk's Office or mailed to the
11    proper party as follows:

12    Julie L Sanpei, Esq. (Bailus Cook & Kelesis)

13    Eckley M Keach, Esq. (Eckley M. Keach, Chtd.)

14    Douglas D Gerrard, Esq. (Gerrard Cox & Larsen)
      dgerrard@gerrard-cox.com

15
      David J. Merrill, Esq. (David J Merrill, PC)
16    david@djmerrillpc.com

17    Robert B. Murdock, Esq. (Murdock & Assocs)
      lasvegasjustice@aol.com

18
      Richard F. Holley, Esq. (Santoro, Driggs, et al)
19    rholley@nevadafirm.com

20

21                                                    Jonathan Burdette

22

23

24

25

26

27

28

- 28 -

1

## CERTIFICATE OF SERVICE

2      I hereby certify that I am an employee of Santoro, Driggs, Walch, Kearney, Holley &

3 Thompson, and that on the ___24th___ day of June, 2010, I caused to be served a true and correct

4 copy of THIRD SUPPLEMENTAL DECLARATION OF RICHARD F. HOLLEY, ESQ. IN

5 SUPPORT OF MOTION TO DISMISS INVOLUNTARY PETITION in the following manner:

6      ☒    (ELECTRONIC SERVICE)  Under Administrative Order 02-1 (Rev. 8-31-04) of

7 the United States Bankruptcy Court for the District of Nevada, the above-referenced document

8 was electronically filed on the date hereof and served through the Notice of Electronic Filing

9 automatically generated by that Court's facilities.

10      ☐    (UNITED STATES MAIL)  By depositing a copy of the above-referenced

11 document for mailing in the United States Mail, first class postage prepaid, at Las Vegas,

12 Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on

13 the date above written.

14      ☐    (OVERNIGHT COURIER)  By depositing a true and correct copy of the above-

15 referenced document for overnight delivery via Federal Express, at a collection facility

16 maintained for such purpose, addressed to the parties on the attached service list, at their last

17 known delivery address, on the date above written.

18      ☐    (FACSIMILE)  That I served a true and correct copy of the above-referenced

19 document via facsimile, to the facsimile numbers indicated, to those persons listed on the

20 attached service list, on the date above written.

21

22      An employee of Santoro, Driggs, Walch,
            Kearney, Holley & Thompson

23

24

25

26

27

28

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

07906-01.001/612909.doc